230

PATRICIA MANATT RAY *v.* SAM L. MANATT JR.

5-5502                                            465 S. W. 2d 111

Opinion delivered March 22, 1971
[Rehearing denied April 26, 1971.]

*Kirsch, Cathey & Brown,* for appellant.

*Smith, Williams, Friday & Bowen,* By: *William H. Sutton* and *Max C. Mehlburger,* for appellee.

J. FRED JONES, Justice. This is an appeal by Patricia Manatt, now Patricia Ray, from an adverse decree of the Western District of the Clay County Chancery Court in a child custody case between herself and her former husband, Sam L. Manatt, Jr. The given names of the parties are hereafter used for convenience.

Patricia and Sam obtained a divorce in Clay County in September, 1960. In contemplation of the divorce, an agreement was entered into, and signed by Patricia and Sam entitled: "Agreement as to Property and Marital Rights and Custody and Maintenance of

Children." This agreement was approved by the court and incorporated as a part of the divorce decree. It reads, in part, as follows:

". . . [S]ince it is desired by both parties to finally and for all time settle and determine and agree upon their individual property rights in all property owned and possessed by either separately, or both jointly, and to provide for the maintenance and welfare of their children:

Therefore, in consideration of the premises, the mutual promises herein made, and the division of property hereinafter set forth, the parties covenant and agree as follows:

1. Patricia Manatt shall have principal custody of parties four (4), minor children: Sam R. Manatt, age 10 years, James D. Manatt, age 9 years, John D. Manatt, age 8 years, and Susan C. Manatt, age 5 years.

2. Sam L. Manatt, Jr. shall have custody of the four children for two (2) months during the Summer, school vacation period of each year, beginning with the year 1961. In addition, Sam L. Manatt, Jr. shall have custody of the children for at least one week, during Christmas, every alternate year; and, his custody of the children during the Christmas period shall commence with the year 1960.

3. Sam L. Manatt, Jr. agrees to pay to Patricia Manatt for the support and maintenance of said four children the sum of $400.00 per month, payable monthly, with payment to begin when a decree of divorce shall have been granted. Said payments shall continue so long as at least one child is living, but shall cease when the youngest child reaches 21 years of age or marries, whichever event occurs first."

After providing that 75 acres of land in Baxter

County together with a runabout boat with motor and trailer, household goods and a Pontiac automobile, should be the property of Patricia, the agreement provided as follows:

> "7. The terms of payment under a life insurance policy in the face amount of $35,000.00, now owned by Sam L. Manatt, Jr., shall be amended to provide that Patricia Manatt shall be the sole beneficiary thereunder. Said policy shall be kept in full force and effect now and at all future times by Sam L. Manatt, Jr. and he shall pay the annual premiums thereon."

The agreement then provided that Sam was to have city property in Corning, all of his stock in the Corning Bank; and all other property not specifically set aside, to go to Patricia. The agreement then provides:

> "11. In consideration of the foregoing covenants and agreements and the receipt of the properties described above, Patricia Manatt releases, relinquishes and waives all her rights to alimony, temporary and/or permanent, and it is agreed and understood that neither party shall have any right, title or interest in the property of the other, real or personal, now owned or hereafter acquired."

This agreement was incorporated as a part of the divorce decree and upon entry of the decree Patricia moved with the children to Colorado and Sam started making the $400 per month payments.

In June, 1961, the oldest child returned to Arkansas to spend the summer vacation with his father. With Patricia's consent he did not return to live with his mother in Colorado, but continued to live with his father. In June, 1962, the other two boys returned to Arkansas at the beginning of the summer vacaion and they too remained with their father, to which arrangement Patricia reluctantly agreed.

Patricia remarried a Mr. Ray in 1963 and the

youngest child, Susan, continued to live with her mother and Mr. Ray in Colorado, except for the summer vacations she spent with her father in Arkansas. At the end of summer vacation beginning in June, 1969, she too continued to live with her father and brothers in Arkansas and failed to return to live with her mother in Colorado.

When the two younger boys continued to live with their father in 1962, Patricia agreed to reduce the monthly payments for child support from $400 to $300 per month. In July, 1963, these payments were further reduced from $300 to $150 per month. Sam contends that this too was done by agreement between him and Patricia, and she contends that she made no such agreement. Nevertheless, payments were continued at $150 per month from 1963 until May, 1969, with the few exceptions when the payments were $175, the difference being attributable to additional expenses for orthodontic services for Susan.

On August 8, 1969, Sam filed his petition for a change in custody of Susan (later amended to include the other children) from Patricia to himself. Patricia filed a response in opposition to the change in custody and prayed judgment for $21,950 in delinquent child support payments. Sam countered by a petition for the cancellation of child support payments. After trial of the case in which both Sam and Patricia as well as the four children testified; the chancellor on May 6, 1970, entered a decree awarding custody of the four children to Sam with the same visitation rights in Patricia as had been awarded to Sam under the original divorce decree. The support money payments were discontinued from and after January 16, 1970.

As to the reduction of the amount for child support awarded in the original decree, the chancellor found that "the evidence does preponderate to the effect that they did agree to reduce them down .o the $150.00 a month." The chancellor found that Sam was indebted to Patricia at the rate of $150 per month for back child support from June, 1969, through

December, 1969, which, together with interest at 6%, amounted to $1,089.90, and a decree was awarded to Patricia for that amount. The chancellor also awarded to Patricia the sum of $286.67 for expenses in answering a discovery deposition and $573.34 expenses in attending court at the hearing on the petition. The court also ordered Sam to pay attorney's fee in the amount of $1,250.

As to the $35,000 insurance policy, referred to in the agreement and incorporated as a part of the original divorce decree, the chancellor found that Sam had kept the policy in force but had borrowed $5,300 on it, and after making provisions for Sam to continue the payment of premiums on the policy and providing for notice to Patricia when and as such payments are made, the chancellor denied Patricia's petition for an order directing Sam to discharge the loan which he had obtained on the security of the policy and to enjoin him from future borrowing thereon.

On appeal to this court Patricia relies on the following points for reversal:

"The chancery court erred in modifying the 1960 decree by taking the custody of Susan Manatt from her mother and awarding custody to her father.

The chancellor erred in canceling retroactively any support money payments ordered by the 1960 decree.

A. The chancery court was without jurisdiction to allow retroactive cancellation of support money obligations.

B. The chancellor's ruling that there was any agreement between appellant and appellee to reduce the support money payments to $150.00 per month is erroneous and should be reversed.

Appellee's defense as to the five-year statute of limi-

tations is not applicable here by reason of payments made within five years of the bringing of appellee's suit.

Appellant is, in any event, entitled to recover the delinquent payments accruing within five years of February 3, 1970.

The chancery court erred in refusing to order appellee to discharge the loan which he had obtained without knowledge or consent of appellant against the insurance policy which appellant was the beneficiary under the divorce settlement and the divorce decree."

We cannot say that the chancellor erred in changing the custody of Susan from her mother to her father. We agree with the statement in appellant's brief that Patricia is shown to have been a dedicated and devoted mother making every effort to meet her daughter's special problem and, at the same time, permitting the daughter to maintain close relations with her father and his family. Patricia is not only shown to have been a devoted and dedicated mother to her 15 year old daughter, she is shown to have been a very wise, discerning and unselfish mother in so far as her relationship with her daughter is concerned; and it is unfortunate, for both her and the daughter, that she has had no assistance in causing Susan to fully appreciate just how unselfish her mother has been.

Both parents were bound to have recognized the probable result of split custody, and the record is clear that Patricia did recognize that she would eventually lose the custody of Susan to her father. There is no question that Patricia was more interested in the happiness of her young daughter than she was in her own. When the second two of the three boys failed to return to Colorado following their summer vacation with their father, Patricia reluctantly agreed that they could stay with their father and she testified that at that point she realized she would someday lose the actual custody of Susan. Perhaps at that point if

Patricia had demanded and received the continued payment of $400 for the support of Susan, she could have furnished Susan with some of the things Susan now seems to think she was denied. Instead of following such course at the risk of alienation between herself and Susan or between Susan and her father, she suggested that the payments be reduced to $300 per month and soon thereafter, whether by agreement or otherwise, she started accepting $150 per month without court order.

There is no hard evidence that Sam directly influenced Susan in desiring to leave the custody of her mother, but certainly there is no evidence that he said or did anything to influence her otherwise. As soon as he received Patricia's answer to his petition for change in custody, he gave it to Susan to read and interpret. Paragraph 2 of the response reads, in part, as follows:

> ". . . [I]n the event the said Susan C. Manatt desires and this court can ascertain that such desire is bona fide on her part to live with the defendant in Corning rather than in Colorado and in the event this court should determine such action would be in the best interest of the said Susan C. Manatt, this plaintiff does not, under such circumstances, desire to oppose a change of custody provided proper assurances are given that the said Susan C. Manatt may visit this plaintiff at her home in Colorado during the summer months when she is not in school and during Christmas vacation."

Susan testified that she concluded from reading the papers filed by her mother that her mother did not want her. There is no evidence that Sam did or said anything to change or redirect such conclusion.

The 19 year old son testified that while he lived with his mother and when he visited her in Colorado, he had to pay some of the expenses of his entertainment ("skiing and such as that") out of his own money his father had given him. He testified that his father also

gave him to read, the papers his mother had filed and he testified, in part, as follows:

"Q. Do you love your mother?

A. Yes, sir.

Q. Has she ever done anything to cause you not to love her?

A. In the past year I have got so I don't respect her so much. It made me mad when Daddy got the papers and I went back to school and me and Sam called her and she said it wasn't anything to do about keeping Susan, that she felt like she deserved more, like the bank stock and things like that."

This brings us to the appellant's second, third and fourth points having to do with the support payments, and these points have given us considerable difficulty; especially in the light of the interpretation the children seem to have placed on their mother's pleadings in this case.

The agreement as to the payment of support money which was incorporated into the divorce decree, appears to have been either carefully or carelessly drawn. The record does not indicate the value of the Baxter County property awarded to Patricia as compared to the value of the Corning property awarded to Sam. The value of the personal property awarded to Patricia is not set out but from its nature it could not have been a substantial amount. The number of shares of the bank stock awarded to Sam is not indicated but he testified that his share of the dividends (besides bonus of $5,000) in 1969 was around $14,000. The agreement entered into between the parties and incorporated into the divorce decree is entirely open to question as to the intent of the parties.

Under the agreement and the decree, the reason for entering into the agreement, as expressed, is "to finally

and for all time settle and determine and agree upon their individual property rights in all property owned and possessed by either separately, or both jointly, and to provide for the maintenance and welfare of their children." It was agreed and decreed that Patricia should have custody for 10 months and Sam should have custody for two months each year. Paragraph 3 of the agreement as carefully or carelessly drawn, makes no provision for suspension of payment while Sam has custody, but simply provides that Sam shall pay to Patricia for the support and maintenance of the four children $400 per month, payable monthly. The agreement then contains this unusual sentence. "Said payments shall continue so long as at least one child is living, but shall cease when the youngest child reaches 21 years of age or marries, whichever event occurs first." This provision reads more like a proviso in a will than in a child support agreement. In part consideration of this agreement Patricia not only relinquished and waived her right to alimony but it was agreed and understood that neither party should have any right, title or interest in the property of the other, real or personal, then owned or acquired in the future.

In 57 A.L.R. 2d, § 2, p. 1141, is found the following:

"In determining the validity and effect, as between divorced spouses, of an agreement by which the former wife releases the former husband from his obligation under the provisions of the divorce decree to pay child support to her, the first question to be considered is whether the agreement meets the tests of validity applicable to all releases. In particular, the agreement must be supported by a valid consideration.

There is ample authority in support of the proposition that as between the former spouses, such an agreement is valid and precludes the former wife from enforcing the child support provisions of the divorce decree, at least as long as the in-

terests of the child are not affected and only an obligation personal to the wife is involved."

In 57 A.L.R. 2d, § 3, p. 1141, is found the following:

"As in the case of other releases, an agreement by which a divorced wife releases her former husband from obligations under the child support provisions of the divorce decree must ordinarily be supported by a valid consideration.

*    *    *

Such an agreement has been held supported by a valid consideration where * * * —the husband assumed the support of the children. Ostrain v. Posner (1926) 127 Misc 313, 215 NYS 259; Bassman v. Bassman (1953, sup) 123 NYS2d 751."

In the Illinois case of *Royster* v. *Royster*, 339 Ill. App. 250, 89 N.E. 2d 279, the wife was granted a divorce and support money by a decree entered on her counter-claim in 1935. In 1938 the parties agreed to a reduction in support payments, which was not approved by the court, and in 1947 the wife brought proceedings to recover the balance of support money. The Illinois Supreme Court held that the trial court had the power to approve or ratify the agreement; and in doing so it could take into consideration changed conditions, if any shown by record, in finances of parties, delay in attempting to enforce original decree, and the corresponding equities presented by record.

In the 1940 Colorado case of *Hill* v. *Hill*, 107 P. 2d 597, in approving a subsequent agreement between divorced parents for a reduction in child support, the Colorado Supreme Court said:

"We know of no rule which precludes parties who are sui juris from entering into such a contract, and, while the court is not necessarily bound by the agreement, if its terms are fair and no fraud

attends its execution, it may be recognized by the court."

In the Illinois case of *Wolfe* v. *Wolfe,* 24 N.E. 2d 871, an agreement between divorced spouses reducing the support money for their minor child awarded by the divorce decree, was held to preclude the wife from enforcing the award by contempt proceedings against the husband. The court pointed out it would be unjust to hold the husband in contempt when the former wife had for five years, without protest, accepted the reduced amount, particularly where the child was cared for by and lived with the mother of the husband, during which time the grandmother contributed to its support. The wife in that case argued that no oral agreement to accept a reduced amount for the support of a minor child is valid unless it receives the sanction of the divorce court.

In the case at bar the chancellor apparently considered the provision for the $400 monthly payments as intended strictly for child support and maintenance and not as a part, or in consideration, of the property rights agreed upon. The provision that the payments would continue as long as at least one child is living, with the additional proviso that the payments would cease when the youngest child reaches 21 years of age or marries, would indicate that these monthly payments were intended as part consideration for an otherwise inequitable property settlement. Especially is this true when the youngest child then living was a girl who would attain her legal majority at 18 years of age. On the other hand, paragraph 3 plainly states that the agreement is to pay for the support and maintenance of said four children, and since the parties apparently so considered it, we cannot say that the chancellor erred in doing likewise.

In any event, the payments were to be made each month and Patricia first agreed that they should be reduced to $300 per month. The chancellor found, on conflicting evidence, that Patricia subsequently agreed that the payments should be reduced to $150 per month,

and we are unable to say that the chancellor's findings are against the preponderance of the evidence as we would be required to do in order to reverse on this point. The fact that Patricia drew monthly drafts on Sam in the amount of $150 for approximately seven years wihout complaint to the court lends some weight in favor of an agreement. This fact also lends weight to Patricia's sense of fairness toward Sam and concern for the mental or psychic welfare of the children. In such close matters as this we affirm the chancellor unless his decree is against the preponderance of the evidence. *Stephenson* v. *Stephenson,* 237 Ark. 724, 375 S.W. 2d 659.

As to appellant's fifth point, we are of the opinion the chancellor erred. The insurance policy is clearly personal property and was so regarded in the agreement and in the divorce decree. While the agreement only provided that Sam would keep the premiums paid and keep the policy in full force and effect with Patricia as the *sole* beneficiary; the findings of the chancellor in the original decree, as to the insurance policy, recite as follows:

"In substance, said agreement provides that the plaintiff shall take . . . a certain life insurance policy . . ."

Under the original agreement, and under the original decree as we interpret them, it was never contemplated that Patricia would be awarded as a part of her property an insurance policy to be burdened with debt to the extent of its loan value. It appears that the intent of the parties, in connection with the insurance policy, was that in the event of Sam's death, Patricia would collect from the insurance company and not from Sam's estate. Sam's income for 1969 was between $30,000 and $50,000 and although the necessity for, and purpose of, Sam borrowing on the insurance policy does not appear in the record—we hold that Patricia is entitled to the policy as it was awarded to her—unencumbered by the loan to Sam.

The decree is reversed as to the insurance policy and this cause remanded to the chancery court for entry of an order directing Sam to pay the loan against the policy forthwith, and for an order restraining him from placing future encumbrances against the policy. In all other respects the decree is affirmed.

The appellant's attorneys have requested, and they are hereby awarded, a fee of $1,250 for their services to the appellant in connection with her appeal to this court.

Affirmed in part; reversed in part and remanded.