CARL A. MOORE *v.* EUNICE (MOORE) SMITH

73-84 and 73-85                    499 S.W. 2d 634

Opinion delivered October 8, 1973

*Milton G. Robinson,* for appellant.

No brief for appellee.

FRANK HOLT, Justice. Appellant sought custody of his 12-year-old son which the court denied. The custody of the boy was continued with the appellee mother. On appeal appellant contends that the chancellor's findings are not supported by the evidence. We think the appellant is correct. We review the evidence, as abstracted, since the appellee does not favor us with a brief.

We first observe that the controlling principle in child custody cases, which are always difficult, is focused solely upon the best interest of the child. In *Stephenson v. Stephenson*, 237 Ark. 724, 375 S.W. 2d 659 (1964), we held:

> "In custody matters the unyielding consideration is the welfare of the children. It matters not to this court which of the parties 'wins' custody, so long as the children are the ultimate winners of good care and home."

Appellant and appellee were divorced in 1963 at which time the appellee was given custody of their 2-year-old son, Carl, Jr. This was appellee's second of five marriages. It appears the appellant and appellee continued to live in the same vicinity. The appellant had enjoyed visitation rights with his son and maintained support payments. For about three months before this litigation, the boy had lived with the appellant father with appellee's consent. The appellee brought contempt proceedings against the appellant at the end of the three months alleging that he had refused to return their son to her. Appellant, by counterclaim, sought custody. The court found that the appellant was not in contempt and continued the custody of the child with the appellee. The appellant appealed from the denial of custody to him. About two weeks after this hearing, the appellant instituted another action seeking custody of his son alleging, *inter alia,* that the appellee mother had physically abused their son and the boy had fled to the shelter of appellant's home, whereupon the appellant took his son to the police and left him in their care. The police, at the direction of the chancellor who had received two telephone calls from appellee seeking advice, returned the child for the time being to the father.

Upon a hearing the court again continued the custody with the appellee. The two adverse decrees as to custody are consolidated on appeal.

In the first custody proceeding, as abstracted, the appellee testified that her son would not mind her although "he minded his father;" her son loves his father more than her; he wanted to live with his father; the father had bought him a mini bike, a Honda, and a sword; she was receiving $93 a month in Social Security payments from appellant for maintenance of the boy until appellant stopped payment to her after she let their son live with appellant for three months; because she had to leave for work at 6:30 a.m., she yielded to appellant's request about three months before this litigation to let the boy stay with the appellant; and this permission was solely for the welfare of the child because the father, who was retired, could let him sleep longer, take him to and pick him up from school. She further testified that the father had kept his agreement with reference to child support; she had never heard the appellant encourage the boy not to mind her, although she could not make the child mind her and that he had no respect for her; and her son had reported to the police that she had "beat" him.

One neighbor testifying for the appellant, stated she had two children approximately the same age as appellant's son and they played together; Carl, Jr., is high strung, high tempered and hard to approach; after he had spent more time with his father his attitude was better; and he played with other children without throwing fits. For the past several months this neighbor had observed a car parked in front of appellee's house on numerous occasions and at times the car was there in the morning; Carl, Jr., said the man's name was Bill; her little girl had made curious inquiry as to why this man was staying there so much; Carl, Jr., was having problems with his grades, although he attended school regularly; and appellee kept Carl, Jr., clean.

The appellant testified that he took his son on short trips with appellee's knowledge; appellee had brought

their son to live with him stating he could live there as long as he wanted to; appellee never asked him to return their son to her during the three months until the day he had the $93 Social Security check stopped being sent to her; he had understood they had a binding agreement that their son would live with him and he had refused to allow the child to return because of her living with Bill, her paramour. On legal advice, however, he permitted the boy to return to appellee with the understanding that she would "stick to her agreement" about not living with Bill; the night the boy was returned to appellee he went to the police because the appellee had whipped him and the police brought the boy to him; he loves his son very much and when his mother brought their son to him in March to live with him, their son was sick and disturbed; after a few hours he "calmed down;" appellee admitted to him Bill was staying with her and it was no one's business except hers. The boy needed orthodontic care which would cost $1,500 or $2,000.

The appellant, again testifying, said that after the boy had lived with him for three months he gained weight but lost weight upon his return to his mother; a few days before this first hearing he had taken him to a doctor who had prescribed medicine for the boy's nerves and another prescription for his stomach; the boy had made failing grades until he reached the sixth grade where he made nearly a "C" average because, he had had three months opportunity to work with him; the appellee admitted to him that it was making their son nervous when she lived with her husband, Max Smith, to whom she was twice married and divorced, inasmuch as they were "having fusses and fights almost continuously."

A playmate of Carl, Jr.'s, testified that a man named Bill lives with the appellee; Bill sometimes stays with the appellee at night and that he had seen them "laying down in bed together," once with their clothes on and another time "they were up under the cover." He further testified that once when he spent the night with Carl, Jr., he awoke and saw Bill going to the bath-

room clothed only in his undershorts. He admitted that he and Carl, Jr., were good friends and had enjoyed shooting guns together. He said appellant had promised to give him a gun. However, he denied it was in relation to the trial.

Carl, Jr., testified that a Bill Andrews lived at their house; he had seen him in the bedroom with his mother and observed him leave her bedroom unclothed. When he complained to his mother about the presence of Bill, she told him it was not any of his business; he was afraid of Bill and had told his mother he wanted to live with his father. Carl, Jr., again testifying, stated that he was in the 6th grade; his father had been carrying him to school for the last two or three years when his mother had left him with his father as she went to work; he ate breakfast with his father and that his father picked him up after school and fed him; his father helps him with his school work and his mother never assists him; his father takes him to Sunday School and that his mother never does so; he had heard his mother cursing his father as well as a subsequent husband, one to whom she was married twice; she and this husband were constantly fussing and fighting; he had observed her drinking; and that he had never heard his father curse or observe him keeping or drinking intoxicants at his apartment. Carl, Jr., testified several times emphatically that he preferred to live with his father.

A juvenile court officer testified that she had observed Carl, Jr., on two occasions and noticed he had a "nervous mannerism consisting of twisting his hair." This caused bald spots on the front of his head. The minister of a local church testified that the appellant was a member of his church, attended with reasonable regularity, and he had observed the appellant bring his son with him. The home of the appellant, who lived alone, was clean and well kept. There was other testimony that Bill was seen at appellee's house where drinking occurred; that appellee had attended local night clubs with Bill as well as being unescorted and dancing with strangers.

Appellee's son, by her first marriage, testified that his mother provides a nice home for Carl, Jr., loves him and takes good care of him. On cross-examination, he admitted that when he had lived in his mother's home, with his mother's knowledge, he was dating a married woman, who was pregnant by him, and further she had spent several nights there. She was later divorced and he married her. He further admitted that during the time appellant and his mother were married, appellant supported his mother as well as himself and his sister.

There was evidence by one witness, who was related by marriage to the appellee, that preceding the first hearing appellant had mentioned $500 to her after her husband said to appellant he was "broke." However, she said no one heard appellant make that statement to her and "they had not been talking about this case."

Appellee adduced evidence from her daughter (appellant's stepdaughter) and another witness that appellee maintained an attractive home and environment, had good meals, and Carl, Jr., was well cared for. The appellee denied that she was living with any man; she considered herself a "good mother" and although she has attended various taverns, she does not drink to excess and always left her son in the care of his father because he is "in good hands;" she was married and divorced five times; she could not control her son and he told her he was going to live with his father because he loves him more than he does her; because he cried and wanted to live with his father she had permitted him to stay there three months "until you get yourself straightened up;" and her son would "lie."

The court continued the custody of the child, as previously indicated, with the appellee mother. Approximately a week following this hearing the appellant, as indicated previously, renewed his petition for custody of the child. At a hearing upon that petition the child testified that a few days after his custody was continued with his mother she became angry with him when he told her, in response to a question, that his love for

his father was greater than for her and that he didn't love her. She struck him and started pulling his hair. As she tried to find a belt he escaped and ran to his father's house and his father took him to the police station; his mother came and took him to his father's where he lived about a week and then had to go back to his mother's; that presently, when his mother leaves at 6:30, she leaves him with his half sister who takes him to school at an early hour resulting in his having to wait at the schoolyard until the building opens.

The appellant testified that when the boy appeared at his home after the altercation with his mother his eyes were red and his hair messed up. He complained that his mother had mistreated him. Appellant took his son to the police station. The appellee later brought the boy from the police station to his house stating that the judge had advised her to do so. The chancellor verified that he had suggested this solution to the appellee since she had called twice saying her son was "out of her control" and she wanted his advice. The appellee admitted that she slapped the boy because he would not mind her and that he left saying "I still hate you and I am going to live with my dad." Again, Carl, Jr., testified and urgently reiterated that he wanted to live with his father and the three months he lived with him were the "happiest" time he had ever had in his life.

It is true that in custody proceedings the mother is ordinarily favored and this maternal inclination entertained by the courts is based on the child's needs especially at an early age. However, we have said "[T]hat principle, however, loses some of its force as the child grows older and is not so strong in the case of a ten-year-old boy as it would have been much earlier in the child's life." *Qualls* v. *Qualls*, 250 Ark. 328, 465 S.W. 2d 110 (1971). As indicated in *Stephenson* v. *Stephenson, supra*, the courts are primarily concerned with the welfare of the child and if the father seems to be the better parent for the child's best interests then the courts will vest custody in the father. *Jackson* v. *Smith*, 250 Ark. 923, 467 S.W. 2d 704 (1971), *Campbell* v. *Richardson*, 250 Ark.

1130, 468 S.W. 2d 248 (1971). The attitudes and wishes of the child, although not controlling, are proper for the consideration of the chancellor in making an award of custody. *Campbell* v. *Richardson, supra.* We have recently approved a change of custody of a 15 year-old-girl to her father where the girl expressed a strong desire to return and live with her father and three brothers. *Ray* v. *Manatt,* 250 Ark. 230, 465 S.W. 2d 111 (1971). In that case the change of custody was approved even though the mother was ". . . shown to have been a dedicated and devoted mother making every effort to meet her daughter's special problem . . ." and she was a ". . . very wise, discerning and unselfish mother."

Of course, chancery cases are tried de novo on appeal and the decree will not be disturbed unless it is against the preponderance of the evidence. We also give particular importance to the chancellor's findings in these cases because of his position to observe the witnesses, their credibility, and the affection or lack of affection demonstrated by the competing parents or parties. *Wilson* v. *Wilson,* 228 Ark. 789, 310 S.W. 2d 500 (1955). However, if the preponderance of the evidence indicates that the chancellor did not award custody to the parent who could best provide for the future welfare of the child, we must reverse. *Cox* v. *Tucker,* 251 Ark. 714, 474 S.W. 2d 675 (1972). In the case at bar, we definitely are of the view that the future welfare and best interests of the child are with the father. The appellee, the mother, has been married and divorced five times—three times following the divorce from Carl, Jr.'s, father. Two of these marriages and divorces were to the same man and it appears undisputed that both of these marriages were characterized by constant cursing and fighting. Carl, Jr., failed in his grades although it appears from the testimony that he was socially promoted. According to Carl, Jr., only his father ever helped him with his studies and took him to Sunday School. It does not appear that his mother denied this. There was evidence that his mother permitted her paramour to live in her home and apparent illicit relations were observed by Carl, Jr., and a playmate. Appellee denied this and presented evidence she maintained a "spotless" house and properly cared for her son.

It could be that the father competed for the love and custody of his son by influencing him and his play-mate as to their testimony. Also, that the parties' 12-year-old son lied as his mother stated he would do. The mother admitted however, that she could no longer discipline the boy and he was "out of control." A disinterested witness, a juvenile court officer, described him as a nervous child who twisted his hair to such an extent bald spots resulted. A doctor furnished a prescription for his nervousness and another for his stomach. Suffice it to say that Carl, Jr.'s, nervous conduct is a persuasive manifestation of the insecurity and instability generated by his unstable homelife. The emotional and physical impact of his experiences living with his mother, coupled with his unequivocal desire and demonstrated efforts to live with his father is sufficient together with the other circumstances, to clearly establish that the evidence preponderates in favor of the child's custody being awarded to his father.

In *Beene v. Beene,* 64 Ark. 518, 43 S.W. 968 (1898), we said:

> ***The elder of the boys, now about nine years old, has probably arrived at that age when a father's peculiar character of oversight and control may begin to be more necessary than the mother's***.

That reasoning is particularly applicable in the case at bar.

Appellant next contends that the chancellor erred in ordering the defendant to pay attorney's fees for appellee's counsel, since there was no showing of need on her part or ability to pay by appellee. The award of attorney's fees is within the sound discretion of the trial court in a child custody case even though an aftermath of a divorce. *Hydrick v. Hydrick,* 224 Ark. 712, 275 S.W. 2d 878 (1955). In the case at bar the chancellor heard the testimony concerning the wages earned by Mrs. Smith. Appellant misplaces the burden of proof here. The burden is on appellant to show that the chancellor abused his discretion. Appellant does not demonstrate he is

258

unable to pay the fees nor that appellee's financial needs did not require the allowance.

The award of custody is reversed and remanded for proceedings not inconsistent with this opinion. The allowance of attorney's fees is affirmed.

Affirmed in part and reversed in part.