MASSEY v. FLINN.

4-5481                                        128 S. W. 2d 1008

Opinion delivered May 15, 1939.

280

W. V. *Thompson* and W. M. *Thompson,* for appellant.

*Dene H. Coleman,* for appellee.

HOLT, J. This proceeding was brought by appellee, Mrs. Nellie Mae Flinn, against Paul Massey, appellant, in the Independence chancery court for a writ of habeas corpus to recover the custody of the infant daughter of appellant who was about two and one-half years of age at the time. Appellant is the father of the child and appellee is its aunt.

Paul Massey married Pauline Pressley in 1927 and to this union two children were born, Richard Paul Massey, now about five years of age, and Patsy Gale Massey, the child here in question. Mrs. Paul Massey died on July 14, 1937, and on February 12, 1938, Paul Massey married Daisy Shell, his present wife.

About two weeks after Mrs. Massey's death her sister, Mrs. Dunlap, at Paul Massey's request, took both children to her home in Little Rock. The boy remained there for about ten days when he was taken to the home of Mrs. Thorn, another sister of Mrs. Massey in Batesville, Arkansas, and about September 20, 1937, the little girl, Patsy Gale Massey, was taken to the home of Mrs.

Thorn also. On September 29, 1937, appellee took the little girl to her home in St. Louis, Missouri, at the request of appellant.

Appellant, immediately upon his marriage to Daisy Shell, took the little boy into his home and assumed his care and custody. In August, 1938, appellee began adoption proceedings in St. Louis, Missouri, for the little girl and upon objections from appellant she later dismissed the proceedings. Thereafter she came to Arkansas, with the little girl, and she and appellant entered into a written agreement giving to appellee the care and custody of the child, Patsy Gale Massey. This agreement is as follows:

"Whereas, the said Paul Massey is the father of Patsy Gale Massey, aged two years, and that shortly after the death of the said child's mother, the said Mrs. Nellie Mae Flinn, who is a sister of the said child's mother, took the custody and care of said child, and has had the care, custody, and control of said child since September 29, 1937.

"Now, for and in consideration of the mutual benefits and agreements hereinafter contained, it is agreed by and between said parties as follows:

"That said child is to remain in the care and custody of the said Mrs. Nellie Mae Flinn, who agrees to care for, support and educate and raise said child.

"The said Paul Massey is to have the right and privilege of visiting said child at any and all reasonable times, in the home of the said Mrs. Flinn; and it is further agreed that the said child shall spend at least six weeks each year with the said Paul Massey, in his home, and such other times as may be mutually agreeable, and when said child shall reach an age of discretion she may also visit her father at such time as she shall also desire, when reasonable and convenient to the parties hereto.

"During school terms said child shall be kept in school and her visits aforesaid shall in no way interfere with her education or school life.

"The said Paul Massey shall also have the privilege of counsel and advising his said daughter as to her education and avocation in life.

"That each party shall refrain from any conduct which shall tend to prejudice said child against the other.

"That the said Paul Massey and his wife shall, at all times, be treated with proper respect by Mrs. Flinn and her family.

"That the said Mrs. Flinn hereby agrees to dismiss the petition for adoption of said child now pending in the courts in St. Louis.

"That the said Paul Massey may make such contributions as he may be inclined to make to said child, but the said Mrs. Nellie Mae Flinn hereby agrees to bear all expenses incident to the raising and education of said child.

"Witness our hands this August 29, 1938.

"(Signed)    Paul Massey,

"Nellie Mae Flinn."

In December, 1938, appellee brought the child from St. Louis and left her with her father, appellant, for a visit. On January 12, 1939, when appellee asked for the return of the child to her, appellant refused, whereupon appellee secured a writ of habeas corpus returnable on January 23, 1939. On the hearing on this writ, the chancellor decreed that appellee have the care and custody of the child for all except sixty days of each year, with the privilege to the father to visit her at all reasonable times, that the expense of bringing the child from St. Louis to the father in Arkansas be borne by appellee, and required her to execute bond in the sum of $2,000 to comply with the court's decree. From this judgment of the court comes this appeal.

On the part of appellee, the record reflects that Mrs. Pauline Massey, the mother of the child, asked appellee, Mrs. Flinn, her sister, on her deathbed to "take care of my baby." Appellee, Mrs. Flinn, testified that appellant asked her to take the baby and wanted her to have its care and custody, that she took the baby to St. Louis to her home and about a month later appellant came and stayed two weeks and tried to get employment. Her home is a modern six-room house. She is part-time employed, but

her husband and daughter have full-time employment. They are well able to care for and educate the child, their combined earnings amounting to about $80.00 a week. From September 29, 1937, when she took the child to her home in St. Louis, to January 12, 1939, appellant has never indicated any desire to take the baby girl from appellee and made no demand for her return. She desired to adopt the child, but upon appellant's objection she did not do so. Following this, the agreement set out above was entered into.

Appellant's present wife lived with her first husband about seven years, but had no children.

When appellee went to appellant's home in January, 1939, to get the child to return her to St. Louis, she found the stepmother, Mrs. Massey, very dirty and the children in a similar condition. She said to Mrs. Massey, "I wish you would not feel like you do toward me," and Mrs. Massey replied, "Why do you come here when you know you are not wanted?" When Paul came in a little later he ordered her out of the house. Appellee feels toward the child as though she were her own. On this occasion the child kept saying, "Let's go home," and cried for appellee to take her home.

The record further reflects that about two months after the death of the baby's mother, Mrs. Flinn had a conversation with appellant relative to his present wife and we quote from her testimony: "Q. You may just inform the court, if you will, why you think Paul Massey is not a fit person to have the care and custody of his own child? A. He told me himself that his wife wasn't any good, when I came for the baby in September, the night before that he didn't come home, and the next morning when he came in he said that he was ashamed of himself, and ashamed of what he did the night before. I didn't know just what he meant, and then he said he had brought his girl friend down from Sage, and spent the night with her, and he said he was ashamed of himself for acting that way, and then he begged me to get him a job in St. Louis, because he wanted to get away from here, and that he couldn't keep away from bad women

here, and that they would not let him alone. Three weeks after that he visited me in St. Louis, and he was talking to me and took a picture out of his pocket, and said, 'That is my girl friend,' and I asked him if it was the same one he spent the night with and he said it was and said she was crazy about him, but that was the way that kind of women were. He said she had been going out with married men, and that he knew she had because one of the men she had been out with told him so, but he said, 'She won't do it any more because she is so crazy about me,' and I said, 'Do you think a woman that would spend the night with a married man would be the right kind of a woman to raise your children?' and then when I learned that he was thinking of marrying this woman I went to Sage to see about it." In appellant's testimony he denied a part of the above conversation, but he himself testified: "Q. I mean what Mrs. Flinn testified to about what you told her about your wife. A. I remember telling her about one night that me and my wife had been to a dance, and we danced until two o'clock, and then went to a sandwich shop and set up there the rest of the night."

The record further shows that the child was seriously ill at one time in St. Louis and that appellee wrote appellant a letter everyday, or every other day, but that he never replied to any of these letters and that he has made no contribution toward the child's support since she has been in appellee's possession.

Appellee's sisters, Mrs. Dunlap, Mrs. Thorn, and Miss Pressley, testified that their sister, the first Mrs. Massey, did not want the little girl reared by a stepmother and that it would be to the best interest of the child to be with Mrs. Flinn, their sister. In the main their testimony corroborates that of appellee.

On the part of appellant, the record discloses that he is a mail carrier earning about $170.00 a month. He testified that appellee, after his wife's funeral, kept after him while he was all torn up to allow her to take the baby to St. Louis with her, but that he told her he wanted the children to grow up together. Mrs. Dunlap said she would keep the children for awhile. He told her he would pay

her $5.00 a week to keep them and he first gave her $6.00 when he took the children to her there and on leaving gave her $5.00 in addition. He didn't have a good home to put the baby in, and at appellee's request took the baby to St. Louis and tried to get work. Never intended to abandon either child. Appellee always promised to return the baby when he provided a home for her. He signed the agreement set out above to avoid fighting adoption proceedings in St. Louis. Appellee talked rough to my wife and was trying to stir up trouble between us and he ordered her out of his house. He insisted that she treat his wife with respect. He did not have all of the conversation with appellee that she claimed. Appellee did not treat his wife with respect. He loves his children and their mother had always said that whatever happened he must keep them all together. None of his wife's sisters wanted the little boy.

There is other evidence from many witnesses that appellant and his wife are suitable people to have the care and custody of this little girl and that appellant's reputation is good.

Appellant earnestly contends here that the evidence in this record is not sufficient to support the chancellor's findings and that divided custody is not conducive to the best development of the child in question. We shall treat these two contentions together.

We recognize the general rule that ordinarily the parent of the child is its natural guardian and is entitled to its care and custody, however, this is not always true. There are exceptions. Of prime concern and the controlling factor is the best interest of the child.

The rule is laid down in *Johnston* v. *Lowery*, 181 Ark. p. 284, 25 S. W. 2d 436, by this court in the following language: "The law recognizes the preferential rights of parents to their children over relatives and strangers, and where not detrimental to the welfare of the children, they are paramount, and will be respected, unless special circumstances demand that such rights be ignored. *Herbert* v. *Herbert*, 176 Ark. 858, 4 S. W. 2d 513; *Loewe* v. *Shook*, 171 Ark. 475, 284 S. W. 726.

"The courts will not always, however, award the custody of an infant to the father, but, in the exercise of a sound discretion, will look into the peculiar circumstances of the case, and act as the welfare of the child appears to require considering primarily three things: (1) Respect for parental affection, (2) Interest of humanity generally, (3) The infant's own best interest."

And again in *Kirk* v. *Jones,* 178 Ark. 583, 12 S. W. 2d 879, the late Judge Hart again stated the rule: "Minors are the wards of chancery courts, and it is the duty of such courts to make any orders that would properly safeguard their rights. This is a habeas corpus proceeding, and the court had the authority to grant the custody of the child to the aunt, provided it finds that the father had forfeited his rights thereto. Three parties are interested in the custody of minor children, the State, the parents, and the child itself. While the right of the father to the custody of his child is paramount, this is denied in many cases, and, regard being had for the welfare of the child, its custody has been placed elsewhere. *Verser* v. *Ford,* 37 Ark. 27; *Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389; *Coulter* v. *Sypert,* 78 Ark. 193, 95 S. W. 457; and *Clark* v. *White,* 102 Ark. 93, 143 S. W. 587, Ann. Cas. 1914A, 739. Other cases from this court and from many other courts of last resort to the same effect will be found cited in a case-note to Ann. Cas. 1914A, 748.

"The permanent well-being of the child more than its present enjoyment is to be considered as of prime importance. No hard and fast rule can be laid down on the subject, and each case must be governed to a large extent by its own particular facts."

We recognize the difficulties confronting the trial court in striving to reach a just decision in cases of this character. However, we also recognize that he is in a better position to weigh the evidence and to arrive at a proper conclusion than this court which sees and hears none of the witnesses. As this court said in *Holmes* v. *Coleman,* 195 Ark. 196, 111 S. W. 2d 474, "We have here the judgment of a circuit judge awarding the custody of

the child to its natural parents, and due effect must be given to that finding.

"In the case of *Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389, Chief Justice Cockrill said: 'The circuit judge had the parties, the witnesses and the child before him, and was charged with the exercise of a sound discretion in disposing of the question.' This was said after a review of the law of the subject of the award of custody of an infant."

We agree with appellant that the written agreement between the parties to this litigation, set out, *supra,* is not binding upon appellant, however, it is of strong probative value as evidence of the feelings, desires and wishes of both appellant and appellee relative to the custody, welfare and best interest of this little child. As was said in the *Holmes* v. *Coleman Case, supra*: "A father cannot, by a mere gift of his child, release himself from the obligations to support it or deprive himself of the right to its custody. Such agreements are against public policy, and are not strictly enforceable."

We do not think that the fitness or competency of the father is the only criterion by which to judge his right to the custody and control of his child. This court in *Willis* v. *Bell,* 86 Ark. 473, 111 S. W. 808, said: "We think the evidence establishes the fact that he (the father) is a man of good repute, that he is in good condition financially, and has a comfortable home shared by his mother, and that the child would be well cared for there, and properly reared. But for the present, at least, what she needs most is a mother's care and attention."

In *Verser* v. *Ford,* 37 Ark. 27, this court said: "In this case the motherless infant was taken by the maternal grandmother with the father's assent, and tenderly guarded through all the perils of infancy. There has been all of a mother's care, and scarcely less than a mother's affection. The child is yet scarcely three years of age, delicate in health; she is in a safe asylum, surrounded by those who may be trusted to guard her anxiously against pernicious influences, and to do the best to instill into her mind such principles as will pro-

mote her future usefulness and happiness. They, too, plead the full strength of natural affection.

"The infant needs female care and guidance of that patient, ever-watchful nature which is better insured by the natural affection of a grandmother than by the inexperienced efforts of a father or the sense of duty of the second wife."

After carefully considering this entire record, we cannot say that the findings of the chancellor are against the preponderance of the testimony, and finding no errors, the judgment is accordingly affirmed.