Cheryl BRUCE, By Her Mother and Father, Janice
BRUCE and Herman L. BRUCE *v.* W.H. DILLAHUNTY,
et al.

87-83                                                739 S.W.2d 522

Supreme Court of Arkansas
Opinion delivered November 9, 1987
[Rehearing denied December 21, 1987.*]

*Lynn Farr*, Central Arkansas Legal Services, for appellant.

*Wright, Lindsey & Jennings*, for appellee.

DAVID NEWBERN, Justice. This is a habeas corpus case
brought by a minor, through her parents as next friends, to cause
the appellees, an attorney and unknown other persons, to produce

---

*Hickman, Hays, and Glaze, JJ., would grant rehearing.

her baby girl. The chancellor denied the writ on the basis that the minor appellant, Cheryl Bruce, had executed a lawful consent to the adoption of the child. We must reverse and remand the case, as we hold Ms. Bruce has shown a right to the custody of her child, and the record does not demonstrate that any such right to custody was shown to have been in the appellees.

The facts reviewed by the chancellor were stipulated by the parties. Cheryl Bruce is an unmarried minor who, at the age of sixteen, gave birth to a daughter on July 28, 1986. The following day she executed an instrument entitled "Consent to Adoption and Release of Custody" by which she purported to release all her rights to custody of her child and to give her full consent to the adoption of the baby. The instrument did not name the prospective adoptive parents, but stated Cheryl Bruce was ". . . willing for her physician to place the infant child with a married couple for the purpose of seeing that the infant is properly maintained and cared for and for the purpose of having the infant adopted by reliable and fitting persons. . . ." Ms. Bruce's parents, who are also appellants, executed separate consents to the adoption of the baby. On August 1, 1986, three days after she had executed the document, Ms. Bruce called W. H. Dillahunty who, she had been told, was the attorney representing the prospective adoptive parents and revoked her consent and attempted to regain custody of the baby. Later, on August 25, 1986, she obtained counsel and formally withdrew her consent by affidavit. Her parents also revoked the consent instruments they had executed. The baby was not returned to Ms. Bruce despite her request and her revocation of the instrument described above.

In their petition for a writ of habeas corpus, filed on September 8, 1986, Ms. Bruce and her parents do not allege, nor have they contended since, that the consent and relinquishment instruments were executed other than voluntarily by them. They alleged that the instrument Ms. Bruce signed was ineffective because it failed to comply with Ark. Stat. Ann. § 56-220 (Supp. 1985) which states that the instrument by which parental rights are relinquished is invalid unless it contains a statement acknowledging that it may be revoked within ten days after it is executed. The petition concluded by alleging that the detention, and the assertion of the right to custody of the baby by "the respondents is not authorized by any judgment, decree or order or by any

provision of law and therefore is illegal and invalid."

The chancellor denied the petition, finding that § 56-220 is inapplicable because it applies only to "agency" adoptions as opposed to "direct" adoptions with respect to which the matter of consent is governed by Ark. Stat. Ann. § 56-208 (Supp. 1985) which contains no requirement that the right to revoke be stated in the instrument of consent to adoption.

## 1. The statutes

In *Temple* v. *Tucker,* 277 Ark. 81, 639 S.W.2d 357 (1982), a minor contested the adoption of her child after the adoption had taken place. She contended that, because she was a minor, the adoption was illegal absent the appointment of a guardian ad litem for her, citing *Schrum* v. *Bolding,* 260 Ark. 114, 359 S.W.2d 415 (1976), a case holding pursuant to our previous adoption law that a guardian ad litem was required for a minor parent whose consent was necessary to the adoption, and Ark. R. Civ. P. 17(b). We held that under the Revised Uniform Adoption Act, the act which contains the sections noted above, a minor who has consented to adoption need not even be notified of the formal adoption proceedings, and thus no guardian ad litem was necessary.

In our decision in *Temple* v. *Tucker, supra,* we uttered the following obiter dicta:

> We might point out the act does not preclude a careful practitioner from seeking the appointment of a guardian ad litem for a minor mother and certainly that precaution would lessen the probability of an attack on the adoption decree in a later proceeding, as occurred in this case, and of a subsequent contention that the minority of the parent contributed to an invalid consent. See 2 UALR L.J. 135 (1979).

> We might well point out that the new adoption act provides yet another method of surrendering parental rights which is intended to be followed where the consenting mother surrenders her child, not directly to the adopting couple, as here, but to an agency, which may later place the child for adoption by parents it selects. The latter method is set out in Section 20 of the act (Ark. Stat. Ann. §

56-220[)] . . . and provides that the consenting parent, regardless of age, can appear before a judge of a court of record or before a representative of the agency and relinquish her parental rights as well as the rights to later withhold her consent. Under this procedure the consenting parent has ten days in which to revoke her consent and the relinquishment is invalid unless this right of withdrawal is stated. [277 Ark. at 84-85, 639 S.W.2d at 358-359]

It is the latter of these statements upon which the chancellor relied in this case to hold that the protections offered to a minor parent in § 56-220 do not apply where the consent is to a "direct" adoption, as provided for in § 56-208, and thus the consent executed by Ms. Bruce was valid.

At least some doubt is cast upon our statement that § 56-220 applies only to "agency" adoptions by the fact that after our decision in *Temple* v. *Tucker, supra,* the general assembly, by Act 879 of 1985, amended that section to reinstate the requirement that a guardian ad litem be appointed for a minor parent purporting to relinquish her parental rights. If called upon to do so, we might have difficulty today saying that the general assembly's intent was to distinguish between so-called "private" adoptions and "agency" adoptions in this respect. A second difficulty we would have in applying our earlier decision to this case is that, although this was not a case in which an adoption agency was involved, there clearly were intermediaries here, *i.e.,* Mr. Dillahunty and the physician, and the record indicates that Ms. Bruce was not told, and may not know to this day, who was to adopt her child. We can see no logic in providing that a minor can relinquish her rights in this situation, where she is neither protected by a guardian ad litem nor told of her right to revoke her relinquishment, and then providing such protections when an adoption agency is involved. We need not, however, answer that question in this case.

## 2. Habeas corpus

This is not an adoption case. We are not deciding, as we had to in *Temple* v. *Tucker, supra,* the validity of an adoption. Literally translated, "habeas corpus" means, "You have the body." *State Department of Public Welfare* v. *Lipe,* 257 Ark. 1015, 521 S.W.2d 526 (1975). The procedure for issuance of the

writ of habeas corpus is set out in Ark. Stat. Ann. §§ 34-1701 through 34-1746 (Repl. 1962). While much of the language of those sections refers to custody of a "prisoner," the writ was obviously intended to be available in the situation before us now. Section 34-1704 refers to seeking the writ ". . . against any person who shall unlawfully have or detain in custody or bondage any infant. . . ." When the person to whom the writ is directed has custody of "the body" pursuant to lawful process the court in which the writ is sought clearly may not, according to § 34-1734, "inquire into the legality or justice of the process, judgment, decree or order of any court, legally constituted, nor into the justice or propriety of any commitment for contempt made by any court, officer, or body corporate, according to law, and plainly charged in such commitment, . . . ." The point to be made here, however, is that there is no such order. We have no idea why, but the record before us shows no temporary custody order, and it does not even show that any party or person has filed a petition for adoption of the child.

█ A chancery court may, in response to a request for a writ of habeas corpus, entertain a full-blown custody hearing and make a determination of who should have custody in accordance with the best interests of the child. *Tucker* v. *Tucker*, 195 Ark. 632, 113 S.W.2d 508 (1938). We have found three cases in which such a hearing resulted in denial of the writ where custody of the child was placed in a party other than the natural parent of the child and the writ was pursued by the natural parent. In *Verser* v. *Ford*, 37 Ark. 28 (1881), the child's mother died shortly after giving birth, and the father allowed the grandparents to care for the child for some three years thereafter. In response to the father's request for a writ of habeas corpus, it was held that where the father had allowed the special ties to grow between the grandparents and the child, it would be wrong to allow him to regain custody of the child even though there was no question of his fitness to have the custody of his daughter. The court made strong references to the highly satisfactory arrangement of leaving the child with the grandparents upon whom the duty of caring for the child would devolve if something happened to the father. It is evident from the opinion that the trial court had before it both the father and the grandparents and was making a determination of which home would suit the best interests of the

child.

In *Washaw* v. *Gimble*, 50 Ark. 351, 7 S.W. 389 (1887), a child was given by a father to members of his church congregation, who were not related to him or the child, when the child was three days old. Some three years later he began proceedings to regain the custody of the child, and ultimately sought a writ of habeas corpus. The writ was denied, and we affirmed. We recognized the paramount right of a parent to a child, but, as in the *Verser* case, we held that where the father had allowed the familial ties to grow and be nurtured the welfare of the child required that those ties not be abruptly terminated. We said the father could forfeit his natural preference by his own conduct in allowing the child to remain in such a situation over a long period. Again, we noted, "[t]he circuit judge had the parties, the witnesses and the child before him, and was charged with the exercise of a sound discretion in disposing of the question." 50 Ark. at 355, 7 S.W. at 390.

In *Massey* v. *Flinn*, 198 Ark. 279, 128 S.W.2d 1008 (1939), a habeas corpus petition resulted in a fitness hearing in which the chancellor, on the basis of the child's best interests, divided custody between the child's father and Mrs. Flinn, an unrelated woman the father had allowed to keep the child since the death of the child's mother. Eleven months after the child had gone to live with Mrs. Flinn, the father and Mrs. Flinn had entered an agreement in writing spelling out the right of Mrs. Flinn to custody of the child and the father's right to visit. While we recognized the instrument as indicative of the father's state of mind when it was entered, we noted it was an unenforceable agreement because public policy prohibits recognition of an agreement by which a father "gives away" his child.

In this case the stipulated facts before the chancellor made no reference to allegations of unfitness or findings of fitness of Ms. Bruce or any other person. Nor has there been any hearing with respect to the best interests of the child. We have no previous order conferring custody of the child upon anyone. Given the natural right of the parent to the custody of her child mentioned in the cases cited above, and again alluded to in *Feight* v. *Feight*, 253 Ark. 950, 490 S.W.2d 140 (1973), and in *Massey* v. *Flynn, supra*, we conclude that the chancellor had no basis for denial of the writ.

Although it is now some eighteen months since Ms. Bruce's child was born and presumably placed with a married couple, the passage of time has not been the fault of Ms. Bruce, as she has tried to obtain the return of her child since the fourth day of its life.

We reverse the chancellor's decision because the respondents did not show entitlement to the child's custody in the face of the mother's claim as the child's natural parent, thus the writ should have issued. We remand the case for the entry of an order consistent with this opinion, and we note that our decision is without prejudice to the seeking of a temporary custody order pending the filing and adjudication of a petition for adoption.

Reversed and remanded.

HICKMAN and HAYS, JJ., dissent.

GLAZE, J., concurs.

TOM GLAZE, Justice, concurring. In my view, the majority reached the correct result but for a wrong reason. The majority opinion seems to state, or at least implies, that the adopting parents could not have prevailed in the biological mother's habeas corpus action because those parents-to-be had no order giving them possession or custody of the newly-born infant. The cases cited in the majority opinion actually run counter to the majority's point in this respect. For example, in the landmark cases of *Verser* v. *Ford*, 37 Ark. 28 (1881) and *Washaw* v. *Gimble*, 50 Ark. 351, 7 S.W. 389 (1887), this court affirmed the trial court's denial of a writ of habeas corpus in each instance because the natural parent abandoned his child to the care of others and familial ties had been established with the new custodians. While no order awarding custody to others was involved in either *Verser* or *Washaw*, the majority attempts to distinguish these cases from the instant one because no hearing was had here concerning the parent's (mother's) fitness or the child's best interests. If such a distinction is adopted by this court, then adopting parents will be required to obtain a court order awarding them custody of the infant in addition to a legally executed consent by the infant's biological parent(s). Such a requirement has never been required under Arkansas's adoption laws, nor do I think it should be.

In this habeas corpus case, the chancellor determined the

adopting parents had lawful custody of the infant. Arkansas, as the majority points out, allows custody issues to be resolved in such habeas corpus proceedings. To reverse the chancellor, this court must decide the chancellor was wrong in his findings, and, I submit, we must do so after a review of the facts and law under which the adopting parents gained physical custody of the infant. To do so requires us to look to Arkansas's adoption laws — a process the majority deems is unnecessary to decide the case.

In an effort to make my position brief, it is sufficient to say that the consent executed by the biological mother did not comply with Ark. Stat. Ann. § 56-220 (Supp. 1985) which I believe controls the type consent required under the circumstances involved in this case. The trial court deemed § 56-220 inapplicable, and in doing so, it relied on this court's decision in *Temple* v. *Tucker*, 277 Ark. 81, 639 S.W.2d 357 (1982) wherein we indicated § 56-220 applies only to adoptions where an adoption agency is involved. This court was wrong in making that statement, since a quick perusal of § 56-220(e) dispels any such thought.

Section 56-220 makes provisions for relinquishment and termination of the requirement of consent by a parent. *See* Commissioners' Note to § 19 of the Revised Uniform Adoption Act (1971). Section 56-207 of Arkansas's Revised Uniform Adoption Act sets forth the persons whose consents are not required, and refers specifically in subsection (a)(4) to a parent who has relinquished his (or her) right to consent under § 56-220. Under § 56-220(b), if the parent is a minor, the consent or written relinquishment by the minor must be signed by an appointed guardian ad litem in the presence of an agency taking custody of the child or, where no agency is involved, in the presence of a judge of a court of record. A minor parent's relinquishment may be withdrawn within ten days after it is signed or the child is born, whichever is later, and the relinquishment is invalid unless it states the parent has the right of withdrawal. *See* § 56-220(b)(1).

In the instant case, none of the requirements in § 56-220(b) were met, plus the minor mother promptly attempted to withdraw her consent three days after she signed it. For these reasons, the adoptive parents never obtained lawful possession or custody of the infant. Having failed to obtain lawful custody of the infant

under our applicable adoption laws, the adoptive parents, barring other grounds sufficient to show lawful custody, should not have prevailed in this habeas corpus action. I concur in the result reached by the majority.

DARRELL HICKMAN, Justice, dissenting. The majority has simply misread the law. No statute or case law requires that a court order exist to legally justify persons other than natural parents to hold a child. Ark. Stat. Ann. § 34-1704 (Repl. 1962) reads:

> [The writ of habeas corpus shall be granted] upon the application, and in the name of the father, mother, guardian, or next friend of any married woman or infant, against any person who shall unlawfully have or detain in custody or bondage any infant or married woman; and like proceedings shall be had for hearing and determining the cause, and affording the relief demanded, as in other cases.

Ark. Stat. Ann. § 37-1734 (Repl. 1962) provides:

> No court under this act shall in any other matter, have power to inquire into the legality or justice of the process, judgment, decree or order of any court, legally constituted, nor into the justice or propriety of any commitment for contempt made by any court, officer, or body corporate, according to law, and plainly charged in such commitment, as hereinbefore provided.

These statutes mean that *if* an order or judgment exists, its legality cannot be challenged in a habeas corpus proceeding. They do not say that a legal consent to adoption is worthless. Those who have a child pursuant to a valid consent have the infant child "lawfully"; therefore, the trial judge properly denied the petition.

It was not denied that the written consent, signed by the mother and her parents, was voluntary. The trial judge held the consent valid according to the law. The majority does not challenge that finding. That legal consent gave these appellees a perfect legal right to custody of the child and the right to adopt the child. It has not been declared void, set aside, nor withdrawn, and until one of these is done, it should stand.

The legal question is whether a mother can withdraw her consent to the adoption of her child? The answer is yes, but the manner and circumstances in which it can be done vary. In this case the mother simply wants to withdraw her consent; she alleges no fraud, mistake or other good cause. She can attempt to withdraw that consent, just as she did, by filing a petition for habeas corpus. *See French* v. *Catholic Community League*, 69 Ohio App. 442, 44 N.E.2d 113 (1942). Alternatively, she may do so by intervening if adoption proceedings have been filed. See Ark. Stat. Ann. § 56-209 (Supp. 1985).

In *Combs* v. *Edmiston*, 216 Ark. 270, 225 S.W.2d 26 (1948), this court discussed the two rules of law that had evolved regarding the rights of natural parents to withdraw consent, citing Annotation, *Right of natural parent, or other person whose consent is necessary to adoption of child, to withdraw consent previously given*, 138 A.L.R. 1038 (1942) and Annotation, *Right of natural parent, or other person whose consent is necessary to adoption of child, to withdraw consent previously given*, 156 A.L.R. 1011 (1945). The court stated the general rule as follows:

> 'The rule in a majority of the jurisdictions wherein the question has arisen is that a natural parent's consent to the proposed adoption of a child, duly given in compliance with a statute requiring such consent as a prerequisite to an adoption, may be effectively withdrawn or revoked by the natural parent before the adoption has been finally approved and decreed by the court.'

The other rule recognized in *Combs* is:

> '. . . that the trend of the more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption of his or her child, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a

"vested right," have been forged between them and the child.

The court said that it did not have to choose the better of these two rules because the teenage mother had signed the consent under duress. In *Martin* v. *Ford*, 224 Ark. 993, 227 S.W.2d 842 (1955), the court followed the rule announced in *A.* v. *B.*, 217 Ark. 844, 233 S.W.2d 629 (1950), to govern withdrawal of consent by a parent. It reads:

> 'The question whether the natural parent may revoke consent previously given depends upon all the circumstances of the particular case, which may include such a variety of matters as the terms of the particular statute; the circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties between the giving of the consent and the attempted withdrawal; whether the withdrawal was made before or after institution of adoption proceedings; the nature of the natural parents' conduct with respect to the child both before and after consenting to its adoption; the "vested rights" of the proposed adoptive parents with respect to the child; and, in some cases, the relative abilities of the adoptive parents and the natural parents to rear the child in a manner best suited to its normal development, and other circumstances indicative of what the best interests of the child require.'

Statutory law recognizes that before withdrawal of consent is permitted, the best interests of the child must be considered. Ark. Stat. Ann. § 56-209 (Supp. 1985), provides:

> (a) A consent to adoption cannot be withdrawn after the entry of a decree of adoption.
>
> (b) A consent to adoption may be withdrawn prior to the entry of a decree of adoption if the Court finds, after notice and opportunity to be heard is afforded to petitioner, the person seeking the withdrawal, and the agency placing a child for adoption, that the withdrawal is in the best interest of the individual to be adopted and the Court orders the withdrawal.

A recent annotation deals with the entire spectrum of the

problem; consent before any adoptive proceedings are initiated, before the placement of a child, and after court orders. Annotation, *Right of natural parent to withdraw valid consent to adoption of child*, 74 A.L.R.3d 421 (1976).

I think the majority decision is wrong for several reasons. A valid lawful consent was granted; it has not been withdrawn in a proper proceeding, and until it has been, the custodians of the child have a superior legal right. Absent good cause to withdraw the consent, such as fraud or duress, a determination of whether withdrawal is in the best interests of the child must be made.

In *Van Wey* v. *Van Wey*, 656 S.W.2d 731 (Ky. 1983), the Kentucky court adopted what I think is the best rule:

> We hold with the trial court that the initial voluntary consent placed this case squarely in the category of cases holding that a parent who has transferred possession and custody of his or her child to another has surrendered the primary right of custody and thereafter the court shall determine custody on the basis of the best interest of the child.

The decision is wrong in my judgment from a legal standpoint, but what is more disturbing is that it is irresponsible. We have a young child's future at stake, and we should not decide that future without foremost consideration of the child's best interests.

I would remand the case for that determination.

STEELE HAYS, Justice, dissenting. The majority opinion directs the chancellor to return the custody of this infant girl to the petitioners without prejudice to the unnamed respondents to establish their adoptive rights to this child. Thus the petitioners, about whom we know nothing except that they knowingly gave up the custody of the child for adoption, will regain custody under this opinion by the summary process of habeas corpus and without any determination of the welfare and best interest of the child. The tragic consequence is that a fifteen month old girl who bears no part of the responsibility for this unhappy situation and who has known only one set of parents from birth is removed from familiar surroundings to foreign surroundings and into the custody of persons who are, to her, total strangers, albeit her biological parent and grandparents. If that wrenching experience

must occur, it ought to come, if at all, *after*, rather than *before*, the legal issues are fully resolved, governed by the best interest of the child. I do not question the right of the petitioners to have the validity of their consent judicially determined, but I earnestly disagree with the majority that the custody of the child should be changed before those issues are decided.

The majority opinion makes only passing mention of the best interest of the child, applying instead the stylized properties of habeas corpus — which do not lend themselves readily to the just determination of adoption disputes. Yet even where habeas corpus is the procedural mode we have consistently looked first to the welfare of the child and denied the writ where the welfare of the child warranted, even in cases where the custody was far more ambiguous than here. In all of the cases cited by the majority where habeas corpus was sought, the court weighed the best interest of the child as decisive: *Feight* v. *Feight*, 253 Ark. 950, 490 S.W.2d 140 (1973) ("The fitness of the petitioner to have custody is the *pivotal issue.*") (my italics); *Massey* v. *Flinn*, 198 Ark. 279, 128 S.W.2d 1008 (1939) ("The *prime concern* and the *controlling factor* is the best interest of the child.") (my italics). *Tucker* v. *Turner*, 195 Ark. 632, 113 S.W.2d 508 (1938); *Washaw* v. *Gimble*, 50 Ark. 351, 7 S.W. 389 (1887) and *Verser* v. *Ford*, 37 Ark. 27 (1881).

In deciding this case as it has, the majority, I believe, has disregarded two important and overriding considerations: (1) The Revised Uniform Adoption Act[1] (on which, it might be noted, the petitioners rely for the disavowal of their consents) provides that before a consent to adoption is withdrawn the best interest of the child shall be considered by the court (Ark. Stat. Ann. § 56-209); and (2) it was the voluntary and purposeful act of the petitioners, rather than the prospective parents, in giving up this child for adoption that brought about the dreaded situation now before us. I believe the welfare and best interest of the child should first be resolved before any change of custody, temporary or permanent, is ordered and for that reason I dissent to the

---

[1] Ark. Stat. Ann. § 56-201 et seq. (Supp. 1985).