MERLE FEIGHT ET AL *v.* ALICE GAY FEIGHT

5-6106                                             490 S.W. 2d 140

Opinion delivered February 12, 1973

*Phillip H. Loh,* for appellants.

*Gordon & Gordon,* P. A., for appellee.

GEORGE ROSE SMITH, Justice. This case involves the custody of two boys, Jeff and Eric Feight, who were respectively nine and seven years old when the appellee's petition was filed in the court below. The principal appellants are the children's paternal grandparents, who appeal from an order confirming the mother's previously adjudicated right to the custody of her sons.

The parents, Richard and Alice Gay Feight, were divorced in Arkansas in June, 1969, custody of the children then being in the mother. In September of that year the matter of custody was litigated in Arizona, where the parties were then living. The court awarded custody of the children to the mother and ordered the father to pay $100 a month for their support. Thereafter the mother moved with the children to Mason City, Iowa, where she obtained employment.

Richard Feight, the father, still lives in Arizona and is actually a bystander in this dispute. In late December, 1971, the paternal grandparents, Merle Feight and his wife, went to Iowa and, with the mother's permission, brought the two boys back to their farm in Conway county, Arkansas, for a stipulated one week's visit. At the expiration of that week, however, the elder Feights went back on their agreement, by refusing to return the children to their mother. Some four months later the appellee filed the present habeas corpus action to recover the actual custody of her sons. The decree, as we have said, was in her favor.

The chancellor was right, under either of the two settled principles that control a dispute of this kind. First, a judicial award of custody will not be modified unless it is shown that there are changed conditions which demonstrate that a modification of the decree will be to the best interest of the children. *Wilkins* v. *Davis,* 244 Ark. 304, 424 S.W. 2d 530 (1968); *Keneipp* v. *Phillips,* 210 Ark. 264, 196 S.W. 2d 220 (1946); *Myers* v. *Myers,* 207 Ark. 169, 179 S.W. 2d 865 (1944).

Here there is no such showing. In fact, there is no proof at all of the conditions that existed when the Arizona court entered its order in 1969. In the present proceedings the appellants have proved nothing, essentially, except that the appellee is a strict disciplinarian in the matter of bringing up her sons. It is not shown, however, that she was not equally strict when custody was awarded to her in the first place. Consequently the necessary proof of changed conditions is wanting.

Secondly, it is firmly settled that, as between a parent and a grandparent (or anyone else), the law awards

custody to the parent unless he or she is incompetent or unfit to have the custody of the child. *Keneipp* v. *Phillips, supra; Baker* v. *Durham,* 95 Ark. 355, 129 S.W. 789 (1910). Thus the privotal issue here is the fitness of the appellee to have the care of her own sons.

Even if the question of the appellee's fitness were the only issue before us, we could not say that the chancellor was wrong in deciding the case as he did. All the evidence unfavorable to the appellee comes either from her own lips or, directly or indirectly, from the lips of her sons, who not only testified but also were quoted extensively by their grandparents. No witness except the mother and the two youngsters purported to have first-hand information about what went on while the boys were living with their mother in Iowa.

We need not read very deeply between the lines in the record to understand why the two boys, after having been in the unlawful care of their grandparents for four months preceding the trial, preferred to remain there. They testified that their mother, who worked during the day, required them to make up their own beds, to scrub floors, to wash dishes, and to do their own laundry. Their mother punished them for failing to do their chores. They also complained about the food they were given, though we have our doubts about the ability of little children to pass upon the sufficiency of their diet.

From the boys' point of view, conditions upon their grandparents' farm were ideal. They were apparently given no chores to perform. They had a Shetland pony, a television set, and free access to a radio. They could eat whenever, and apparently whatever, they wanted to. The only indication of discipline during the four months is a statement that the younger boy was spanked once with a switch.

The appellee testified positively, without apology, that she is strict with her children. She gives them chores to perform and punishes them for misconduct. When the younger boy had a tantrum and refused to stop screaming she held his head under a water faucet for about ten seconds. There had been one or two previous

incidents of the same kind. Upon another occasion, when Eric refused to do anything that he was required to do, she locked him in a basement room (which had a window) for about half an hour.

The record does reflect one disinterested point of view. The appellee testified that her husband employed a lawyer to have "the social services department" investigate conditions in her home. In the appellee's words, "they came at their leisure one evening to see my home and my situation and said they were very much impressed with the children, my home and myself. And offered to go to court for me if I had any trouble whatsoever in the future." It is immaterial that the quoted testimony was hearsay, for no objection was made either to the appellee's testimony or to that of the grandparents, whose evidence was almost entirely a narration of what the two children had told them.

In conclusion, we should make it clear that it is not the courts' responsibility to weigh this mother's strictness against the grandparents' permissiveness. Not even Solomon could make that decision with the assurance of being right. The only questions before us are whether the appellants have shown a change of conditions since the Arizona court entered its decree and whether the appellee is so unfit to bring up her own children that she should be permanently deprived of their custody. We cannot say upon either issue that the chancellor's decision is against the weight of the evidence.

Affirmed.

HARRIS, C. J., dissents.

CARLETON HARRIS, Chief Justice, dissenting. It is somewhat with reluctance that I write these dissenting remarks for I have always been a strong believer in home discipline, and am of the view that many a delinquent boy or girl has acquired that deplorable status because of a lack of discipline at home. In other words, I sometimes think that as many, or more, delinquents are created by being overprivileged, as by being underprivileged. Nonetheless, I cannot bring myself to approve of the disciplinary methods used by this mother on her two sons.

In making these remarks, I shall not depend on the testimony of the grandparents (who acquired their information from the boys) since this is hearsay (though not objected to) and shall only relate some of the incidents testified to by the boys themselves, or incidents admitted by the mother.

The four most notable examples in my view are (1) the breaking and giving away of the boys' toys and presents, (2) the incarceration of the younger in what the boys and mother referred to as the "devil's room", (3) sending the children to school without breakfast, and (4) holding the younger boy's head under a water faucet. In discussing these instances, let us look to the record, though the occurrences will not be discussed in the order listed. The two boys, Jeffery and Eric, are nine and seven years of age respectively. The mother admitted holding Eric's head under a water several times, stating that she did this because he was having a "tantrum, screaming and yelling". Another punishment, which I consider extreme, was administered on occasions when the mother stated Eric was misbehaving. She took him to the basement (referred to as the "devil's room") and locked him in by himself. There were no lights in the basement and he would be kept there for some period of time as his punishment. From the record:

"Q. What other kind of punishment have you used other than putting him underneath the water?

A. And spanking him.

Q. What else?

A. And there was a time when he decided he just would not do anything he was required to do. I said fine, if you've separated yourself from the family, you go down in the basement and stay in the room down there.

Q. How long did he stay in that room down there?

A. Half an hour maybe.

Q. How many times did you leave him down there all day?

A. I never shut him anywhere all day. I never shut him away anywhere. Perhaps thirty minutes or less.

Q. Go ahead, what other punishments have you used?

A. That's it.

Q. Do you know about this devil's room?

A. That's the little room I was telling you about.

Q. And you put him in this room? Did it have any lights in it?

A. Lights in it?

Q. Yes.

A. No, it didn't.

Q. Did you lock the door?

A. Yes, I did.

Q. What was in the room?

A. Just a bunch of little old suitcases and things like that.

Q. Just a bunch of junk?

A. Uh-huh.

Q. How long would you keep him locked in a room like that?

A. Maybe a half an hour.

Q. No window light or electric lights?

A. There was a window and there was light in the room that came in around the door. The door is not a tight door at all."

I cannot agree that proper discipline includes inducing a child to fear the dark.

According to the nine-year-old son, Jeffery, the two boys were assigned various tasks, scrubbing floors, mopping, washing dishes every night and the next morning, making their own beds, etc. (and certainly I have no objection to the assigning of tasks or jobs). However, Jeffery testified that if the tasks were not performed by the time the mother returned home from work, the boys went to bed without supper, and if they did not complete the morning chores by 7:00 A.M., they didn't get any breakfast. I cannot approve sending these boys to school without breakfast since it could well be detrimental to their health.

More inhumane than these facts, in my opinion, was the action of this mother in destroying and giving away the toys and presents given to the children. Eric testified that if he didn't get his work done on time, appellee would pick up a toy and say "You're not going to enjoy having this toy" and would stomp on it. He also said that she had given some of his toys and clothes to the "Goodwill", including a pair of boots that he had received as a present, and was never permitted to wear.[1]

The breaking of the toys was not denied by the mother and she also admitted giving them away. From the record:

"Q. What—tell us about the toys they have. A few toys? Lot of toys?

A. Since I have been divorced they have been provided a great amount of toys through their grandparents and through their father. There was very little left that I could give them.

Q. Is your closet like the one in my house, it's overflowing with toys?

A. That's right.

---

[1] These boots were given by the grandparents who, at the time of the trial, were keeping these children.

Q. And—

A. I saw fit to get rid of most of their toys and injurious things so I could provide these myself."

**********

Q. Did you from time to time give away the boys' presents like bicycles?

A. Yes, I did.

Q. Did you replace them?

A. I have replaced most of them.

Q. Did you replace the bicycles?

A. I have not."

This breaking and giving away of toys and presents seems to me to be utterly senseless, and I can only conclude that this is occasioned by hatred of the father and his parents, not a desirable sentiment or trait to impart to one's children.

Not only that, but the mother only receives $300.00 per month take-home pay, and she can hardly afford to spend a portion of this money replacing toys and presents.

I have not mentioned several other matters[2] testified to by the children since the ones already mentioned, in my opinion, should preclude the mother from being given custody at the present time.

The majority mention that there has been no showing of a change in circumstances since the original decree. The evidence does not reflect the testimony given at the time the divorce was granted, but the things that I have mentioned took place after the awarding of the

[2]For instance, Jeffery testified that he and his brother slept in the basement on beds "made for camping. We called them camping bunk beds." The bunks contained no mattresses or springs. "All they had was the cloth on them. Just like a cot."

divorce and custody. Of course, there actually has been a change in that the children are living with their grandparents, and do not desire to return to their mother. Also, other women friends lived with the mother and her children for a period of time, the children complaining that these women whipped them with a board, called the "board of education".

The majority also mention that the evidence denotes that the home was investigated by the Social Services Department. Appellee testified:

> "I assume my husband had hired a lawyer to have my situation of communal living investigated and they came at their leisure one evening to see my home and my situation and said they were very much impressed with the children, my home and myself. And offered to go to court for me if I had any trouble whatsoever in the future."

The fact remains that, though the present litigation shows a full-scale custody action, no testimony, through deposition or otherwise, was given by employees of the department.

It might be that if appellee presently lost custody by virtue of the actions mentioned, she would recognize that the law does not condone the acts of a person, even a parent, in going beyond the realm of reason in administering disciplinary action.

I, therefore, respectfully dissent.