Michael Scott CAMPBELL *v.* Bonnie CAMPBELL

CA 97-380 975 S.W.2d 869

Court of Appeals of Arkansas
Divisions III and IV
Opinion delivered October 7, 1998

*Appellant,* pro se.

*Susan M. Johnson,* for appellee.

JOHN F. STROUD, JR., Judge. Bonnie and Michael Scott Campbell were divorced in November 1993, and Mr. Campbell was granted custody of their daughter and son. Ms. Campbell subsequently filed a motion to modify custody on the basis of changed circumstances. Her motion was granted after a hearing in December 1996. At that time, the younger child, the son, was eight years old. Mr. Campbell filed a motion for reconsideration that was denied, and this appeal ensued.

Mr. Campbell, a third-year law student when custody was changed, proceeds *pro se* in the appeal. He contends that "the chancellor abused his discretion in determining that it was in the best interest of the minor children to be placed in the permanent custody of appellee when it was clearly against the preponderance of the evidence." From a review of the record *de novo,* we find that a material change in circumstances did occur, and for the reasons set forth below, we affirm the chancellor's decision that it was in the best interest of the children to change custody to Ms. Campbell.

The principles governing the modification of custody are well-settled. In all such cases, the primary consideration is the best interest and welfare of the child, and all other considerations are secondary. *Watts v. Watts,* 17 Ark. App. 253, 707 S.W.2d 777 (1986). Custody awards are not made or changed to gratify the desires of either parent, or to reward or punish either of them. *Id.* In determining matters of child custody, a chancellor has broad discretion, which will not be disturbed unless manifestly abused. *Id.* The original decree is a final adjudication that one parent or the other was a proper person to have care and custody of the child, *id.*; custody should not be changed unless conditions have altered since the decree was rendered or material facts existed at the time of the decree but were unknown to the court, and then only for the welfare of the child. *White v. Taylor,* 19 Ark. App. 104, 717 S.W.2d 497 (1986). The burden of proving such a change is on the party seeking the modification. *Watts v. Watts,* 17 Ark. App. 253, 707 S.W.2d 777. Although this court reviews chancery cases *de novo,* we will not disturb the findings of the

chancellor unless they are clearly against a preponderance of the evidence. *Id.* Since the question of preponderance of the evidence turns largely on the credibility of the witnesses, we defer to the superior position of the chancellor. *Id.* This deference to the chancellor is even greater in cases involving child custody. *Id.* In those cases, a heavier burden is placed on the chancellor to utilize to the fullest extent all of his powers of perception in evaluating the witnesses, their testimony, and the child's best interest. *Id.* We have often stated that we know of no cases in which the superior position, ability, and opportunity of the chancellor to observe the parties carry as great a weight as those involving minor children. *Id.*

Ms. Campbell, who previously had been hospitalized for depression, testified that this illness was due to the break-up of her marriage, Mr. Campbell's seeing another woman, and the first custody fight. She stated that her treating physician released her in March 1994 and that she no longer suffered depression. She testified that she had been assistant manager of Briarwood Apartments for three years and that she had a new job with ERC Properties as district manager of four properties containing two hundred units each.

Dr. Phillip Barling, a psychologist, interviewed the children at the court's request concerning allegations made by Ms. Campbell in her motion for change of custody. He also visited with Mr. Campbell. He submitted a report to the chancellor and testified at the hearing. He stated that Ms. Campbell had previously asked him to see the children, but he had told her that he could not do so without permission of Mr. Campbell or the court.

Dr. Barling testified that he did not feel that the children were in physical danger but that he was concerned about their emotional functioning. He described Michael at the time of the interview as fearful and visibly upset, even to the point of crawling up onto the doctor's lap and crying. He said Michael was very concerned that his father would be angry with him for what he said in the interview, and Dr. Barling saw Michael as being overwhelmed by "the whole situation."

Dr. Barling also testified that Nicole told him that she had figured out she could avoid trouble by just staying in her room and reading. Her notion of staying out of trouble by isolating herself caused him some concern that she was developing coping patterns that could cause more problems later on. Dr. Barling stated, "While Michael was more obviously emotionally distraught, I was concerned really about both children."

The children's teachers and Mr. Campbell's friends testified regarding the children's relationship with their father and their impressions of the children. The teachers described both children as good students; Michael as a happy, wonderful boy; Nicole as happy, mature, responsible, and well-adjusted; and Mr. Campbell as a supportive father who visited the school often and was very involved with his children. Friends attested that Mr. Campbell and his children had a good, loving relationship.

Mr. and Ms. Campbell and their witnesses testified that the respective parents had loving family relationships with the children. The parties also testified regarding their noncompliance with an order in their divorce decree that they not have overnight guests of the opposite sex when the children were present. Ms. Campbell testified that she lived with her boyfriend, David Garner, and had done so for two years before the hearing. She stated that the relationship was stable and beneficial, and that the couple planned marriage. Mr. Campbell testified that although a girlfriend had stayed overnight with him on occasion, the children were never aware of it because she slipped out of the window early in the mornings. He admitted to being arrested in front of his children for disorderly conduct when he poured beer on the girlfriend, who was attending the county fair with another man.

During the hearing, the chancellor interviewed the children in chambers. At the conclusion of all the evidence, the chancellor announced the following findings from the bench:

> [A]fter hearing the parties and their witnesses and having considered the evidence and after having lengthy conversation with the children in chambers, Court's findings are that . . . in all probability I would not change custody in this case if it were not for Michael's overwhelming desire to be with his mother, *I am*

*convinced that because of Michael's desire to be with his mother that his best interest can only be served by placing him with her.*

While I believe Nicole's best interest would not be harmed if she were left in the custody of her father, the Court believes it is in both children's best interest to stay together.

Accordingly, I am awarding custody of both children at this time to their mother, subject to visitation set out in the Court's standard visitation order in the father.

This is a painful decision for the Court because in many ways, the Court believes that the children's father has done an outstanding job in raising these children . . . .

However, *after lengthy interview with the children I find Michael to be as Dr. Barling did, a tearful, stressed, almost frightened little boy who desperately wants to be with his mother.* When I reminded Michael how hard his father had tried to be a good father to both him and his sister [he started] crying and said, "He's not going to let us go to Mom."

In summary, this little boy wants and needs his mother for whatever reason and *I am convinced not to grant this desire would be emotionally damaging if not devastating to him.*

*My job is to do what is in the children's best interest,* not their parents['], no matter how much sympathy I may have with one of those parents. . . .

(Emphasis added.)

After the order was announced, appellant's counsel asked, "Are you not making any provision that Ms. Campbell has to either marry this man or separate from his household? Are you condoning and going to allow, through your order, that the children be over there . . . ." The chancellor replied, "I'm going to be watching that. That is a concern of mine . . . . Ms. Campbell can conduct herself accordingly."

Within days of the order, Mr. Campbell filed a motion for reconsideration based on two statements allegedly made by Michael at the conclusion of the hearing when the parties were leaving the courtroom on December 19, 1996. The motion stated that Michael had handed his father a note which read, "I am sorry I lied and spyed [*sic*]"; and that the bailiff had heard Michael tell his mother, "I guess I get my cellular phone now." Mr. Campbell's motion contended that the chancellor erred in basing his

decision on the desires of an eight-year-old child, especially in view of the two statements. Responding to the motion, Ms. Campbell stated that Michael had not had a chance to hand his father anything in the courtroom, that the deputy had not been close enough to hear clearly, and that Ms. Campbell had given Michael a $15 set of walkie-talkies, which looked like cell phones, as a Christmas present. The chancellor denied Mr. Campbell's motion, stating that even if Michael's statements were true, they were not sufficient reasons for reconsideration.

A guardian *ad litem* appointed for the children submitted a report to the court that is not a part of the record. The record includes only a letter from the chancellor to the guardian, written after Mr. Campbell's motion for reconsideration was denied, which responds to the guardian's apparent disagreement with the chancellor's decision to change custody to Ms. Campbell. The letter includes the following:

> I felt that placing Michael back in the custody of his father would run the risk of Michael having an emotional breakdown, notwithstanding the fact that Michael might not have any justifiable reason for feeling such stress and emotional anxiety. However, it is obvious that the feelings of anxiety and stress are not necessarily logical ones. I felt that Michael needed to be removed from his present environment and the fact that his mother's home does not furnish a perfect environment is regrettable, but I still believe it is one that will be less stressful for Michael and less dangerous to his emotional health than his father's. It may be that Michael's placement will not be successful, but I am convinced that the evidence justifies giving it a try.
>
> I wish the choices in child custody decisions were black and white, but unfortunately, they seldom are. Mrs. Campbell has limitations as a custodian, . . . but at least for the time being I believe Michael's emotional health will be better served in her home than in his father's.
>
> As far as the children being placed in "what has traditionally been considered an unwholesome environment" and the court "essentially giving a stamp of approval to the arrangement," I had to balance the positive and negative factors in both homes when making my decision. The fact that Mrs. Campbell is not married to Mr. Garner was a negative factor which weighed against her receiving custody. The statement that the court has given a

stamp of approval to her living arrangement reveals a lack of appreciation for the difficulty the court experienced in weighing all of the factors that went into the court's decision. As far as giving Mrs. Campbell a time table to get married, I am simply not prepared to state that I will remove custody from her if she is not married within a given length of time, notwithstanding the fact that I have put her on notice her remaining unmarried while custodian of the children puts her custodianship at risk.

We now turn to the point of appeal as stated by appellant: "that the chancellor abused his discretion in determining that it was in the best interest of the minor children to be placed in the permanent custody of appellee when it was clearly against the preponderance of the evidence." In support of this sole point of appeal, appellant makes several arguments, including: 1) that the appellee was not in a more stable emotional condition since the last custody hearing; 2) that although Michael might have been distressed the day of the hearing, there was more than ample evidence that he had been happy and well-adjusted living with the appellant; and 3) that there was ample evidence of the appellee's attempt to influence the children to want to live with her. It is not necessary to address the foregoing arguments beyond stating that they either involve findings of fact or determinations of credibility made by the chancellor, with respect to which we find no clear error. The question of preponderance of the evidence turns largely on the credibility of the witnesses and we defer to the superior position of the chancellor.

Appellant's remaining arguments in support of his point of appeal are that "the chancellor erred and abused his discretion" 1) by holding that significant circumstances had changed and 2) by basing the change of custody of the minor children on the desire of an eight-year-old boy to be with his mother. We address these arguments below, also incorporating into them appellant's additional assertions that the chancellor erred by considering appellee's cohabitation with her boyfriend as a stable relationship, that the children are being subjected to a "reprehensible" relationship regarding their mother's cohabitation with her boyfriend, and that there had been no significant change of circumstances in the custodial home of the minor children.

*Whether changed circumstances were significant enough to warrant a change of custody*

 In making the conclusory statement that the children are subjected to a reprehensible lifestyle, appellant cites no caselaw, statute, or other authority that cohabitation itself disqualifies a parent from obtaining custody. Although cohabitation is regarded as a negative in a custody determination, we view it as but one factor along with all other factors to be considered in deciding the best interest of the children. We note that here, while Ms. Campbell is in a continuous live-in relationship with her boyfriend, Mr. Campbell allowed a girlfriend to spend nights with him when the children were home, to sneak out the window, and to re-enter the home in the mornings.

Finally, we turn to the issue of changed circumstances, which the chancellor addressed as follows:

> In regard to whether circumstances have changed since the last custody decision, there is no question that they have. Mrs. Campbell has a steady job. She appears to be emotionally stable at this time unlike before and she is in an apparent stable relationship with a man . . . , notwithstanding the fact that the Court has misgivings about this out of wedlock relationship.

Appellant argues that appellee presented no evidence of changed circumstances in appellant's home or on his part and that, in citing changes only on the part of appellee, the chancellor erroneously shifted the burden of proof from the moving party to the custodial parent.

 In *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996), the supreme court found that the chancellor erred in shifting the burden of proof away from Dr. Jones, the party seeking modification of the initial custody award, to require Ms. Jones, the non-moving party, to prove her ability to adequately provide an emotionally stable home environment for their child. The supreme court, viewing this erroneous shifting of the burden of proof together with the chancellor's faulty reliance on Ms. Jones's move from Conway to Little Rock and Dr. Jones's remarriage as material changes in circumstances, concluded that the chancellor's

decision to change custody to Dr. Jones was clearly erroneous. Citing Jeff Atkinson, *Modern Child Custody Practice*, § 9.07 at 462–63 (1986), the court acknowledged the majority view that a change of circumstances of the noncustodial parent, including a claim of an improved life because of recent marriage, is not sufficient to justify a modification of custody. The court found that under the circumstances of the case, including the fact that at the time of the original divorce decree it was within Dr. Jones's reasonable contemplation to remarry, his remarriage did not constitute a material change in circumstances. *Jones v. Jones*, 326 Ark. 481, 490-91, 931 S.W.2d 767, 771-72 (1996). We do not read the *Jones* case to say that changes in the life of the noncustodial parent are never pertinent in determining whether a significant change of circumstances has occurred, but that they were insufficient under the facts of that case to modify custody. In the instant case, unlike *Jones*, the chancellor did not shift the burden of proof to the custodial parent.

 Although the chancellor here cited only changes in appellee's life as the basis for the change of custody, we find from our *de novo* review of the record that there was other evidence of changed circumstances and that appellee met her burden of proof. Dr. Barling stated that he was concerned about the emotional health of both children. He testified that Michael feared that his father would learn what the boy told the psychologist and that he exhibited unusual behavior by crying and climbing into the psychologist's lap. He opined that Michael was in obvious emotional distress and that Nicole's coping method of isolation could cause later problems. The chancellor, after interviewing the children, found Michael to be a tearful, stressed, almost frightened little boy with an overwhelming desire to be with his mother. There was also evidence that appellant had been arrested for disorderly conduct in front of the children after pouring beer on a former girlfriend. Taken together, this constitutes evidence that circumstances of the children's living with their father had changed sufficiently for the chancellor to consider whether the best interests of the children would be served by a change of custody to their mother.

*Whether the chancellor erred "by basing the change of custody on the desires of an eight-year-old boy"*

We initially note that the weight to be assigned testimony is a matter for the chancellor. Appellant argues that the basis of the custody change was solely the young boy's preference. The chancellor's stated reason for changing custody was not merely the preference stated by the minor son, but the harmful effect that the chancellor perceived the boy would suffer if custody were not changed. After considering all the evidence, interviewing the children, and concluding that the boy would suffer emotional harm if custody were not changed, the chancellor based his decision on the best interests of the children.

This case involves a close question of child custody, one in which we must defer to the chancellor more than at any other time. We cannot say that his decision that the change of custody was in the best interests of the children was clearly against the preponderance of the evidence.

Finally, we note that appellant's reply brief also raises the argument that the decision to place Michael with his mother was contrary to Arkansas Code Annotated section 9-13-101, under which custody must be awarded without regard to the sex of the parent. We will not address this argument, for the abstract does not reveal that it was raised below. Neither do we address arguments in the reply brief based upon the credibility of witnesses and the weight of testimony.

Affirmed.

JENNINGS and BIRD, JJ., agree.

ROBBINS, C.J., MEADS and ROAF, JJ., dissent.

JOHN B. ROBBINS, Chief Judge, dissenting. I believe the prevailing judges perpetuate a chancellor's error today by failing to reverse an order that changes custody of two young children, contrary to their best interest, and without proof of a material change in relevant circumstances. I disagree with the prevailing opinion in three essential respects. First, there is an absence of any material change of circumstances apart from those involving appellee, the

noncustodial parent; next, I disagree with the weight given to the custodial preference of an eight-year-old child; and finally, I do not believe serious consideration was given to an illicit sexual relationship in which the appellee is involved.

*Material Change of Circumstances*

The prevailing opinion seems to say that in *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996), the supreme court did not adopt the majority view that changes only in the life of the noncustodial parent cannot constitute a sufficient change in circumstances to reopen the custody issue. However, the prevailing opinion then undertakes a de novo review of the record and finds two basic changes in circumstances apart from those in appellee's life. First was the overwhelming desire of Michael, age eight, to live with appellee, and the second was an incident that resulted in the appellant being charged with disorderly conduct. I believe the prevailing opinion is in error on both bases.

If the prevailing judges are reading *Jones* as having held that changes solely in the noncustodial parent's life may constitute a sufficient change to reopen the custody issue, then I submit they are wrong. In *Jones*, the supreme court cited Professor Atkinson, *Modern Child Custody Practice*, § 9.07 at 462-463 (1986), and acknowledged that it set forth the majority view that a change of circumstances of the noncustodial parent, including a claim of improved life because of recent marriage, is not sufficient to justify modifying custody. The supreme court then cited *Delgado v. Silvarrey*, 528 So.2d 1358 (Fla. App. 3 Dist. 1988), where a noncustodial parent's remarriage and anticipated higher standard of living did not amount to circumstances sufficient to support a change in custody; and *Spoor v. Spoor*, 641 N.E.2d 1282 (Ind. App. 3 Dist. 1994), which held that changes in lifestyles, including remarriage, by the noncustodial parent do not warrant a change in custody. I believe that significant changes in the life of a noncustodial parent should permit reopening the issue of custody between the competing parents; however, it appears that the supreme court has spoken, and by implication it has adopted the majority view set forth by Professor Atkinson.

The chancellor identified the changed circumstances on which he relied in modifying custody as follows:

> In regard to whether circumstances have changed since the last custody decision, there is no question that they have. Mrs. Campbell has a steady job. She appears to be emotionally stable at this time unlike before and she is in an apparent stable relationship with a man . . . , notwithstanding the fact that the Court has misgivings about this out of wedlock relationship.

Because these three changes pertain solely to the noncustodial parent, and inasmuch as the majority view has now become the rule in Arkansas, these changes fail to constitute a significant change in circumstances sufficient to open the door to a review of custodial placement.

As to the prevailing opinion's reliance upon a de novo review to find a significant change of circumstances apart from those in the noncustodial parent's life, I believe the prevailing judges' conclusions are strained and not well based. Though the prevailing opinion identifies the overwhelming desire of Michael to live with his mother as a significant change of circumstances, there is nothing in the record to indicate that this is a changed circumstance. How do the prevailing judges know that Michael did not have this same desire to live with his mother when custody was previously placed with appellant? Since the record is silent on this, I submit that the prevailing judges have erroneously shifted the burden of proof to the custodial parent by finding this to be a change in circumstances in the absence of proof of what the circumstances were at the time custody was placed with appellant in November 1993.

The other event that the prevailing opinion identifies on de novo review as a significant change in circumstances is the disorderly conduct charge against appellant. However, the prevailing opinion cites no cases where a single, isolated event of misconduct, which caused the children no physical harm nor placed them in risk of physical harm, has been held to constitute a significant change in circumstances for custody purposes. Nor do I know of any such cases.

## Best Interest of the Children

### (a) Custodial preference of an eight-year-old child

Although there was not proof of sufficient changes in circumstances to permit the issue of custody to be addressed by the chancellor in this case, I submit that even had significant changes been shown, it is contrary to the best interest of these children to be placed in the custody of appellee. The chancellor explained the basis for changing custody in his remarks from the bench, as follows:

> [A]fter hearing the parties and their witnesses and having considered the evidence and after having lengthy conversation with the children in chambers, Court's findings are that in although *in all probability I would not change custody in this case if it were not for Michael's overwhelming desire to be with his mother,* I am convinced that because of Michael's desire to be with his mother that his best interest can only be served by placing him with her.
>
> While *I believe Nicole's best interest would not be harmed if she were left in the custody of her father,* the Court believes it is in both children's best interest to stay together.
>
> Accordingly, I am awarding custody of both children at this time to their mother, subject to visitation set out in the Court's standard visitation order in the father.
>
> This is a painful decision for the Court because in many ways, *the Court believes the children's father has done an outstanding job in raising these children against tough odds, being a student with a limited income and limited time.*
>
> *He has been there for the children when their mother was not. I am impressed by the teachers, by the testimony of the children's teachers who in summary said that the children are excellent students, cheerful and that their father has had a very concerned — has been a very concerned, involved parent.*
>
> However, after lengthy interview with the children I find Michael to be as Dr. Barling did, a tearful, stressed, almost frightened little boy who desperately wants to be with his mother. When I reminded Michael how hard his father had tried to be a good father to both him and his sister he started crying and said, "He's not going to let us go to Mom."

> *In summary, this little boy wants and needs his mother for whatever reason* and I am convinced not to grant this desire would be emotionally damaging if not devastating to him.

(Emphasis added.) I submit that the emotions of an eight-year-old child should not constitute the gauge for determining custody. If we countenance tantrums in the judge's chambers by rewarding this conduct, the trial-tactic message we send out to attorneys in domestic-relations practice is obvious. The expert to whom the chancellor referred was Dr. Barling, and he testified as follows:

> I don't feel like I'm in a position to give a recommendation today to the court as far as who should have custody. There are a lot of factors to be considered. I didn't evaluate these factors.
>
> In Ms. Gibbon's report she describes Nikki as perceiving her mother as someone who needs to be cared for and stated that she has to be careful about her mother's feelings. That Nikki played the role of the mother in the relationship, that she had to be the mother. This is something that should be taken into consideration. It's the parenting situation, the parenting skills, the stability of the parents, as well as the physical factors of shelter, schools, things like that.
>
> It isn't always common that children who have a parent who's had emotional problems and psychological problems to feel they are the caretaker for their parent. It depends on the age of the children, but the need to comfort or want to take care of, those kinds of behaviors, care taking behaviors, are not unusual.
>
> . . . .
>
> There is a quote in Ms. Gibbons report that Nikki indicated that Mrs. Campbell told the children that she was "homeless and she had no children." That kind of statement would be in poor judgment. The result would be very negative in my opinion. It would be a matter of rejection, it had a negative impact. Pleasing parents is a very strong motivation for most all children.

The risk of manipulation of an eight-year-old to tell a chancellor what a parent wants the child to say and how to say it is so great that a court should not rely solely on the child's preference in making a custody determination. Such a burden should never be placed on the shoulders of a small child; and we abdicate our

adult responsibility to determine the best interest of a child when we let the child decide this very serious issue.

Furthermore, I find it somewhat inconsistent for the court to decide the custody issue on the stated basis of the preference of this eight-year-old child, but yet deny appellant's motion for reconsideration by holding that even if the child apologized to appellant after the hearing for *lying* and *spying* and remarked to appellee as they were leaving the courtroom that "I guess I get my cellular phone now," that these statements were insufficient reasons for the court to reconsider its decision.

### (b) Illicit cohabitation

Finally, the matter of cohabitation by appellee with her boyfriend, while not disregarded by the trial court, did not influence its decision. It should have. The only reason our judicial system is ever involved in such an intimate family matter as this is because the family has become dysfunctional; one or both of the parents have sought the aid of a court to terminate their marital relationship; and because they cannot agree to custody of their minor children they require the intervention of a court to decide the matter. The exercise of this intervention can impact the rights to privacy and association of consenting adults. So long as a person's conduct does not violate the law, his lifestyle is and should be a private matter between him and his conscience. But when children enter the picture — minor children who are *wards of the court*, *Clark v. Reiss*, 38 Ark. App. 1501, 831 S.W.2d 622 (1992) — society has an interest in seeing that these children are placed in the parent's custody who will better provide for their physical, educational, cultural, and moral character development.

Our courts have never condoned a parent's illicit conduct or lifestyle when such conduct has been in the presence of the child. *Ketron v. Ketron*, 15 Ark. App. 325, 692 S.W.2d 261 (1985). It has never been necessary to prove that illicit sexual conduct on the part of the custodial parent is detrimental to the children, for our courts have presumed that it is. *Thigpen v. Carpenter*, 21 Ark. App. 194, 730 S.W.2d 510 (1987). In *Anderson v. Anderson*, 18 Ark.

App. 284, 715 S.W.2d 218 (1986), a case that involved a situation very similar to the one at bar, the father of a nine-year-old son sought a change of custody, citing his ex-wife's cohabitation with a man as evidence that she was an inappropriate custodian. His ex-wife subsequently married the man with whom she had been living, and the trial court denied the father's petition for change of custody. On appeal, we made this observation:

> [W]e cannot say the chancellor was clearly erroneous in finding . . . that appellee's subsequent marriage to Rick tempered her reprehensible conduct. In so holding, we note that the chancellor was in a superior position to assess the sincerity of the appellee's atonement for allowing Rick Beightol to move into the home without benefit of marriage, her subsequent marriage to Rick and the effect of this transgression on the welfare of Will.

*Id.* At 289, 715 S.W.2d at 221. We affirmed a chancellor who characterized the mother's illicit cohabitation as "reprehensible conduct," and a "transgression." However, because the mother married her boyfriend prior to the custody hearing and the chancellor found that this tempered her meretricious relationship, we affirmed the chancellor's decision to leave the child in the mother's custody. In the case at bar, however, there was not a subsequent marriage. Though the live-in boyfriend suggested that they had been too busy to obtain a marriage license, they have found time to cohabit for the past two years. His commitment to marriage appears somewhat less certain than appellee's, as evidenced by the fact that he has not given appellee an engagement ring, and by his statement that "*if* we're married Mrs. Campbell will have a legal interest" in the house he plans to build within the next year or so.

The prevailing opinion appears to equate appellant's relatively brief relationship with a former girlfriend with the appellee's cohabitation. However, appellant's girlfriend did not reside with him. She spent the night with him on a few occasions but did so without the children's knowledge. Furthermore, this relationship terminated months before the court's custody decision was entered. The appellee's illicit cohabitation continued even to the time of the hearing and, as far as we know, persists to this day.

I do not contend that a parent's illicit cohabitation should be an automatic and absolute bar to custody. There must be a better alternative custodian before custody is denied on the basis of such cohabitation. Indeed, a cohabitating parent would be preferable as a custodian if the other parent is abusive or otherwise incapable of parenting a child. If the competing parent has satisfactory parenting skills and is able to provide a suitable home and environment for the child, this would constitute the preferable alternative. In the case before us, the appellee is cohabitating with a man out of wedlock. Appellant is not.

Appellant has proven his parenting skills and ability to provide a suitable home for his children. The court specifically noted that "the children's father has done an outstanding job in raising the children against tough odds," and that "he has been there for the children when their mother was not." The chancellor further stated that he was impressed by "the testimony of the children's teachers who in summary said that the children are excellent students, cheerful and that . . . [appellant] has been a very concerned, involved parent."

These children should have remained in the custody of their father, and we do them a disservice to affirm a removal of custody to their mother.

For all those reasons stated herein, I respectfully submit that the chancellor erred in changing custody of the parties' two minor children and would reverse and remand the case to the trial court with directions that custody be returned to appellant, subject to such reasonable visitation as the chancellor may direct.

Because we have reached a tie vote in this case, the chancellor's decision must be affirmed. Ark. Code Ann. § 16-12-113 (Repl. 1994). It would be instructive for appellant to seek a review of this decision in our supreme court. Ark. Sup. Ct. R. 1-2(e)(i).

MEADS and ROAF, JJ., join in this dissent.