Michael Scott CAMPBELL *v.* Bonnie CAMPBELL

98-1288                                    985 S.W.2d 724

Supreme Court of Arkansas
Opinion delivered February 18, 1999

.

*Appellant,* pro se.

*Susan M. Johnson,* for appellee.

Том Glaze, Justice. This custody case commenced when the parties were divorced in 1993. Michael Scott Campbell (hereafter Scott) was awarded custody of Natasha Nicole and Michael Scott (hereafter Michael), and Bonnie was given visitation and ordered to pay child support. Both parties were prohibited from having guests of the opposite sex overnight when the children were present. In 1996, Bonnie filed a motion alleging that a change of circumstances had occurred that warranted placement of the children with her, and after a two-day hearing, the chancellor agreed. Scott appealed the chancellor's decision to the court of appeals, which by a 3-3 decision affirmed the chancellor. *Campbell v. Campbell*, 63 Ark. App. 136, 975 S.W.2d 869 (1998).

Scott petitioned for review, citing the court's recent decision of *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1997), and arguing the court of appeals' prevailing opinion failed to follow the *Jones* holding by allowing the chancellor to modify his original custody order by basing his modification only on changes that had taken place in the life of the noncustodial parent, Bonnie. We granted Scott's petition because of the court of appeals' divided vote and the obvious need to develop further the law adopted by this court in *Jones*.

The court of appeals' prevailing opinion reflects the relevant circumstances that have occurred in the Campbells' lives since their divorce, and commences by describing Bonnie's serious mental depression resulting from the parties' divorce and their first custody fight when Scott was awarded the children. *See Campbell,* 63 Ark. App. at 140, 975 S.W.2d at 871. We need not repeat those facts in detail again, but will allude to them as necessary when discussing applicable law in reaching our decision. Suffice it to say at this point, we believe the court of appeals' recitation of the facts is correct. In summary, everyone can agree that Bonnie's mental and personal welfare has improved to some degree since the parties' divorce in 1993, and while the children appear to be suffering from some amount of emotional anxiety, they are happy and doing well in school and have no apparent physical problems. The parties and their separate witnesses opined that Scott and Bonnie each possessed a loving relationship with Nicole and

Michael. Nicole and Michael were ages ten and eight years old when Bonnie filed this litigation in 1996.

The evidence presented showed that both parents have violated the court's original order prohibiting them from having overnight guests of the opposite sex when the children were present. Furthermore, while the chancellor spent little or no time discussing Scott's and Bonnie's personal differences and the acrimonious conduct between them, the record reflects they both continue to treat each other contemptuously even when they are in the presence of the children.

At the conclusion of the two-day hearing, the chancellor made the following findings upon which he entered an order transferring custody to Bonnie:

> [T]he court is convinced because of Michael's desire to be with his mother that his best interest will be served by placing his custody with her. While the court believes Nicole's best interest would not be harmed if she were left in the custody of her father, the court believes it is in the best interest of both children not to be separated.
>
> *   *   *
>
> In summary, this little boy wants and needs his mother, for whatever reason, and the court is convinced that for the court to thwart this desire would be emotionally damaging, if not devastating, to the child.
>
> *   *   *
>
> In regard to whether circumstances have changed since the last custody decision, there is no question that they have. *Mrs. Campbell has a good job, she appears to be emotionally stable unlike before, and she is in an apparent stable relationship with a man, David Garner, notwithstanding the fact that the court has misgivings about this out of wedlock relationship.* (Emphasis added.)

In his appeal before the court of appeals, Scott emphasized the chancellor's foregoing findings and argued the chancellor had erroneously shifted the burden of proof to him, though he was the custodial parent. Scott premised his argument on our *Jones* decision, wherein this court adopted the majority rule that a

change of circumstances of the noncustodial parent is not suffi-
cient to justify modifying custody. *Id.* at 490, 931 S.W.2d at 770.
The court of appeals, in its prevailing opinion, rejected Scott's
argument by distinguishing the *Jones* case as follows:

> We do not read the *Jones* case to say that changes in the life of the
> noncustodial parent are never pertinent in determining whether a
> significant change of circumstances has occurred, but that they
> were insufficient under the facts of that case to modify custody.
> In the instant case, unlike *Jones*, the chancellor did not shift the
> burden of proof to the custodial parent.
>
> Although the chancellor here cited only changes in appel-
> lee's life as the basis for the change of custody, we find from our
> *de novo* review of the record that there was other evidence of
> changed circumstances and that appellee met her burden of
> proof. Dr. Barling [who interviewed the children at the chancel-
> lor's request] stated that he was concerned about the emotional
> health of both children. He testified that Michael feared that his
> father would learn what the boy told the psychologist and that he
> exhibited unusual behavior by crying and climbing into the psy-
> chologist's lap. He opined that Michael was in obvious emo-
> tional distress and that Nicole's coping method of isolation could
> cause later problems. The chancellor, after interviewing the chil-
> dren, found Michael to be a tearful, stressed, almost frightened
> little boy with an overwhelming desire to be with his mother.
> There was also evidence that appellant [Scott] had been arrested
> for disorderly conduct in front of the children after pouring beer
> on a former girlfriend. Taken together, this constitutes evidence
> that circumstances of the children's living with their father had
> changed sufficiently for the chancellor to consider whether the
> best interests of the children would be served by a change of cus-
> tody to their mother.

*Id.* at 146, 975 S.W.2d at 874.

■   Arkansas law is well settled that a judicial award of cus-
tody will not be modified unless it is shown that there are changed
conditions which demonstrate that a modification of the decree
will be in the best interests of the children. *Feight v. Feight*, 253
Ark. 950, 490 S.W.2d 140 (1973). In order to avoid relitigation of
factual issues already decided, courts will usually restrict evidence
in a modification proceeding to facts arising since the prior order.

The only other time a change is permissible is when there is a showing of facts affecting the best interests of the children that were either not presented to the chancellor or were not known by the chancellor at the time the original custody order was entered. *Jones*, 326 Ark. at 491, 931 S.W.2d at 772; *Henkell v. Henkell*, 224 Ark. 366, 273 S.W.2d 402 (1954) (stating that it is well settled that a decree fixing the custody of a child is final on conditions then existing and should not later be changed unless there are altered conditions since the decree was rendered or there were material facts existing at the time of the decree but unknown to the court, and then only for the welfare of the child). The party seeking modification of the custody order has the burden of showing a material change in circumstances. *Jones*, 326 Ark. at 491, 931 S.W.2d at 772.

Here, as pointed out by the court of appeals, the chancellor's expressed findings dealt only with Bonnie's change in circumstances since the parties' 1993 decree which, under *Jones*, would be insufficient to warrant transfer of custody to her. Nonetheless, the court of appeals by *de novo* review considered other testimony that it believed was sufficient to support the chancellor's transfer of custody to Bonnie. This court's holding in *Stamps v. Rawlings*, 297 Ark. 370, 761 S.W.2d 933 (1988), supports such a review.

In *Stamps*, the chancellor failed to make a finding of fact about a change in circumstances, but under its *de novo* review of the record, the court related evidence from which the chancellor could have found a change in circumstances after the initial decree. Those circumstances were described as follows:

> It includes testimony that the appellant [mother] screamed and yelled at the appellee [stepfather] in front of Tara; that appellant telephoned the appellee numerous times while appellee was attempting to visit Tara; that Tara was dirty when appellee picked her up; that she had an infected ear and a dirty scalp; that on four separate occasions she had bruises on her lower body, which could have been caused by appellant's use of excessive force; that appellant forced Tara to eat in the garage on at least one occasion, and that when Tara rang the doorbell and asked for a glass of water she was spanked; and finally, that Tara wanted to live with

appellee, and when told she had to go home with appellant, she suffered stomach problems.

Based on the circumstances above, the *Stamps* court upheld the chancellor's decision to change custody.

The situation and circumstances in the instant case are in stark contrast to the ones listed by this court in *Stamps*. In the present case, and as mentioned earlier, *the chancellor* specifically found that he *believed Nicole's best interests would not be harmed if she were left in her father's custody*, but because Michael had a strong desire to live with his mother, the chancellor would not separate the children. Although it was appropriate for the chancellor to consider keeping the two children together, *Larson v. Larson*, 50 Ark. App. 158, 902 S.W.2d 254 (1995), the chancellor gave no reason why Michael's removal from his father's custody would relieve the son's stress. In fact, the chancellor's remarks at the end of the hearing were as follows:

> This is a painful decision for this court because in many ways, the court believes the children's father has done an outstanding job in raising these children against tough odds, being a student with a limited income and limited time.
>
> He has been there for the children when their mother was not. I am impressed by the teachers, by the testimony of the children's teachers who in summary said that the children are excellent students, cheerful and that their father has had a very concerned — has been a very concerned, involved parent.

Other remarks by the chancellor suggest that his ultimate decision to award Bonnie custody was based largely on Dr. Phillip Barling's testimony as well as his own interview of the children. The chancellor, like Dr. Barling, found Michael "a tearful, stressed, almost frightened little boy who desperately wants to be with his mother, and when the chancellor reminded Michael of how hard his father had tried to be a good father . . . he [started] crying and said, 'He's not going to let us go to Mom.'" In summary, the chancellor stated:

> [T]his little boy wants and needs his mother *for whatever reason* and I am convinced not to grant this desire would be emotionally damaging if not devastating to him.

My job is to do what is in the children's best interest, not their parents, no matter how much sympathy I may have for one of those parents. (Emphasis added.)

We would point out that, while both Dr. Barling and the chancellor found that Nicole and Michael had experienced some emotional distress, neither Dr. Barling nor the chancellor specifically assigned the sole blame to either parent. Dr. Barling, who had only thirty minutes to visit and consult with each child, testified to the following various comments and views:

(1) Scott disciplined the children by making them write sentences, but this is not an unusual or inappropriate form of discipline. The children felt the "sentences" were harsh.

(2) Dr. Barling agreed that it is a distinct possibility this case could be one in which the "grass is greener on the other side."

(3) The children's stress had not interfered with their schooling. They were happy there and made "A's" and "B's."

(4) The children's general functioning while living with their father seemed okay.

(5) Nicole voiced concern about her father's anger, but had developed a way to cope with it.

(6) Dr. Barling conceded that Bonnie possibly implanted improper suggestions in the children's heads and those suggestions became a part of reality.

(7) One of the main problems in this case is the Campbells' inability to deal with one another, and this inability, in part, had to do with Bonnie's being overly emotional.

(8) Dr. Barling had no opinion about custody in this matter and had insufficient contacts to form a custody evaluation.

(9) The children had been upset over an incident that occurred between their father and his former girlfriend at the county fair, which resulted in their father's arrest.

(10) Michael crawled up in Dr. Barling's lap and begged, "Don't tell my father." Dr. Barling stated that he believed this was unusual but could not explain the dynamics or causes that came into play to lead Michael to act out in such a way. Dr. Barling recommended further counseling for both children.

(11) Children being aware that a custody battle is going on between their parents can be a major stressor.

(12) Dr. Barling acknowledged another counselor's (Gibbon's) report, written in 1995, that described Nicole as perceiving her mother as someone who needs to be cared for and stated that [Nicole] has to be careful about her mother's feelings. Nicole further was said to have played the role of mother in her relationship with Bonnie. The Gibbon report also reflected that Bonnie told the children she was "homeless and she had no children." Dr. Barling stated that such a statement would be in poor judgment, would be a rejection, and would have a negative impact.

■ We have gone to great lengths to recount what evidence the chancellor had before him when he transferred custody of the children to Bonnie. After carefully reviewing that evidence, we are unable to say material changes of circumstances affecting the children's best interests and warranting the removal of the children from Scott's custody have occurred since the chancery court's 1993 order. Without even discussing the considerable favorable testimony given by the children's five teachers and Scott's other witnesses, the evidence reveals, as the chancellor said, that Scott has performed "an outstanding job" in raising the parties' children against tough odds.

While the record reflects that Scott might have been too strict on occasions, the children appear to function well at school and with others. As to the genesis of the children's emotional stress, Dr. Barling was uncertain as to the exact cause, and gave several possible sources from which the children's distress could have originated, not the least of which is the parents' inability to deal with one another.

■ This case, reduced to its core issue, is whether Michael's apparent preference to be with his mother is sufficient to support the affirmance of the chancellor's decision. We are mindful of the settled rule that the attitudes and wishes of the child, although not controlling, are proper for the consideration of the chancellor in making an award of custody. *Moore v. Smith*, 255 Ark. 249, 499 S.W.2d 634 (1973). In addition, we also recognize that the General Assembly has directed that the custody award

"shall be made without regard to the sex of the parent, but solely in accordance with the welfare and best interests of the children." Ark. Code Ann. § 9-13-101(a) (Repl. 1998).

■ ■ Here, we have an eight-year-old boy who wants to be with his mother, but when the award of custody was made, Scott was found to be the proper custodian. While Scott has made some mistakes in raising both children, the evidence reveals that Nicole and Michael are functioning quite well. Though we understand the chancellor's sensitivity to young Michael's expressed preference for his mother, we do not believe Michael's wishes should be controlling in these circumstances, especially when testimony was presented indicating Bonnie may have implanted improper suggestions in the children's minds. To uproot the children from Scott's custody when the preponderant evidence shows they are doing well would be wrong. At the least, to countenance such a decision would be contrary to this court's settled rule that custody changes are warranted only when material changes of circumstances are demonstrated, and changing this rule could permit a change of custody where only the slightest evidence of changed circumstances is presented.[1]

■ It is well settled that chancery cases are reviewed *de novo* on the record, but we do not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Slaton v. Slaton*, 336 Ark. 211, 983 S.W.2d 951 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*; *AD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986).

In conclusion, we note the children's guardian ad litem voiced concerns about placing the children with Bonnie when Bonnie was shown to be violating the court's order by living with

---

[1] We note that Bonnie apparently has had the children since 1996 when the chancellor entered his change-of-custody order, and there is nothing in the record to reveal what material changes may have occurred after entry of the chancellor's last order. Suffice it to say, this court must rest its decision on what the record reflected in 1996.

a man without benefit of marriage.[2] The chancellor explained that he weighed this as a negative factor and was concerned about the situation, but would not give Bonnie a length of time within which to get married or end her living arrangement. We merely point out at this stage that this court and the court of appeals have never condoned a parent's promiscuous conduct or lifestyle when such conduct has been in the presence of a child. *Ketron v. Ketron,* 15 Ark. App. 325, 692 S.W.2d 261 (1995); *see also Digby v. Digby,* 263 Ark. 813, 567 S.W.2d 290 (1978); *Walker v. Walker,* 262 Ark. 648, 559 S.W.2d 716 (1978); *Harmon v. Harmon,* 253 Ark. 428, 486 S.W.2d 522 (1972); *Northcutt v. Northcutt,* 249 Ark. 228, 458 S.W.2d 746 (1970); *Thigpen v. Carpenter,* 21 Ark. App. 194, 730 S.W.2d 510 (1987); *Scherm v. Scherm,* 12 Ark. App. 207, 671 S.W.2d 224 (1984); *Bone v. Bone,* 12 Ark. App. 163, 671 S.W.2d 217 (1984); Homer H. Clark, Jr., *The Law of Domestic Relations in the United States,* § 19.9 at 845 (2d 1988).

The *Ketron* court stated that while the difficulty of enforcement of a court's noncohabitation order is a factor to consider when determining the custody issues, it is not conclusive. *Id.* at 329, 692 S.W.2d at 264. The court further recognized appropriately that if the parent violating the chancellor's order fails to heed his admonitions, the chancellor may take more drastic steps to ensure the children are raised in a proper custodial environment. *Id.* We would add that the purpose of the prohibition of the overnight-guest order is to promote a stable environment for the children, and is not imposed merely to monitor a parent's sexual conduct. Nonetheless, the parents in this case should be admonished once more that Arkansas's settled law does not condone a parent's promiscuous conduct or lifestyle.

We reverse and remand for the above reasons.

ARNOLD, C.J., BROWN and THORNTON, JJ., concur.

RAY THORNTON, Justice, concurring. The *de novo* review conducted in the prevailing opinion of the Court of Appeals discloses that there was some evidence to sup-

---

[2] Scott, too, had a girlfriend who on past occasions (before their breakup) had stayed overnight, but because she left through a window, the children were unaware of her stay.

port a finding that a material change in circumstances existed, and that this material change in circumstances called for a change in custody in the best interest of the minor children. Unfortunately the chancellor did not make findings disclosing how he evaluated this evidence. Rather than making such findings, the chancellor expressed concerns about the children's insecurity and stress shown both by words and actions of the children, and ordered a change in custody based upon those concerns.

I want to affirm the chancellor's decision because I am convinced that it was drawn from a careful and sensitive effort to advance the interest of the children. We defer to a chancellor on his findings of fact because the trial judge has the opportunity to evaluate the evidence and consider the credibility of the witnesses, and we should sustain those findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Nicholas v. Wray*, 325 Ark. 326, 333, 925 S.W. 2d 785, 789 (1996).

Here, we are not informed as to the particular findings of fact that may have led to the chancellor's decision that the best interest of the children required a change of custody. If particular findings supporting the change of custody have been articulated by the chancellor, we should give great deference to those findings. Here, the chancellor appears to have concluded that it was in the best interest of the children to live with their mother based upon the desire of the eight-year-old son. That is not sufficient.

Under these circumstances, while expressing my belief that the chancellor is entitled to deference, I reluctantly concur in the result reached by the majority because the chancellor did not make sufficient findings of fact upon which an appellate court could rest an affirmance.

I am authorized to state that Chief Justice ARNOLD and Justice BROWN join in this concurrence.